**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 12 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

BRIAN SPEARS,

      Petitioner-Appellee/
      Cross-Appellant,

v.

MIKE MULLIN [*], Warden,
Oklahoma State Penitentiary,

      Respondent-Appellant/
      Cross-Appellee.

Nos. 01-6258
&
01-6267

DUDLEY ALLEN POWELL,

      Petitioner-Appellee/
      Cross-Appellant,

v.

MIKE MULLIN, Warden,
Oklahoma State Penitentiary,

      Respondent-Appellant/
      Cross-Appellee.

Nos. 01-6349
&
01-6354

## APPEAL FROM THE UNITED STATES DISTRICT COURT

---

[*] Mike Mullin replaced Gary Gibson as Warden of the Oklahoma State Penitentiary effective March 25, 2002.

Seth S. Branham, Assistant Attorney General (W.A. Drew Edmondson, Attorney General of Oklahoma with him on the briefs), Oklahoma City, Oklahoma, for Respondent-Appellant/Cross-Appellee.

Randy A. Bauman, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for Petitioner-Appellee/Cross-Appellant Brian Spears.

Mark Henricksen (Lanita Henricksen with him on the briefs) of Henricksen & Henricksen Lawyers, Inc., El Reno, Oklahoma, for Petitioner-Appellee/Cross-Appellant Dudley Allen Powell.

Before **TACHA** , Chief Judge,  **LUCERO** , and **HARTZ** , Circuit Judges.

**LUCERO** , Circuit Judge.

Convicted in the Oklahoma courts of the first-degree murder of Jimmy DeWayne Thompson and sentenced to death, Brian Spears and Dudley Powell each filed a 28 U.S.C. § 2254 petition seeking relief from their convictions and sentences.[1]  After concluding that photographs introduced during the second stage of trial rendered the sentencing stage fundamentally unfair, the federal district court granted relief from both Spears' and Powell's death sentences, but denied

---

[1]  Another co-defendant Claiborne Johnson III, pled guilty to first-degree murder and received a life sentence without possibility of parole in exchange for his testimony against Spears and Powell.

relief on numerous other claims challenging both defendants' convictions. We now consider four appeals: the State appeals the district court's grant of habeas relief from the death sentences, and Spears and Powell cross-appeal the denial of relief on the other claims. Because all four appeals arise out of the same set of facts and present similar issues, we join them for disposition. Exercising jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253, we take the district court's view of the issues and affirm.[2]

# I

On the evening of September 21, 1990, the day Thompson died, Thompson, age twenty-two, Spears, age twenty, and Spears' then girlfriend, Vickie Hensley, were cruising around Pauls Valley, Oklahoma, in Thompson's truck. At Spears' request, Thompson purchased alcohol and the three began drinking. During the evening, they drank a cocktail of Kool Aid and Everclear from a gallon milk jug, as well as whiskey and beer. They were joined at various times by Powell, age eighteen, Claiborne Johnson III, age twenty-two, and Mickey Daniels, none of whom had met Thompson before that evening. Sometime after Powell joined the group, Spears began driving the truck because Thompson was intoxicated. During

---

[2] Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), petitioners cannot appeal the denial of habeas relief under 28 U.S.C. § 2254 unless a certificate of appealability is granted ("COA"). In the instant case, a COA was granted on all issues discussed in this opinion.

the course of the evening, they stopped at several places to refresh their supply of alcoholic beverages.  Later, they decided to continue imbibing at the Klondike Cemetery, a popular drinking spot.

On the way to the cemetery, Powell and Spears discussed beating Thompson and taking his truck.  At the cemetery, all exited the truck.  Powell told Spears, Johnson, and Daniels that he was going to "jump" Thompson and that they should join the beating.  (3 Tr. at 712.)  As the group walked along the cemetery road, Powell hit Thompson in the head with his fist.  With the first blow, Thompson fell to the ground, where he lay "moaning" and "hollering."  (4 id. at 942.)  Johnson began kicking Thompson, while Powell kicked and jumped on Thompson's head and chest.  At some point, Johnson and Powell began hitting Thompson with their fists.  Spears also joined the beating and began jumping on and kicking Thompson on the chest and possibly his head.  The beating lasted from three to ten minutes.  Neither Daniels nor Hensley participated; after observing the attack for sometime, they returned to the truck.

After the beating, Spears grabbed Powell and Johnson by their arms, produced a knife, and said that they had to kill Thompson because he could testify against them.  Each stabbed Thompson several times.  Sometime during the stabbing attack, Powell momentarily returned to Thompson's truck, where Hensley and Daniels had retreated, and told them Johnson had stabbed Thompson

4

in the throat. Powell told them that Johnson intended to take Thompson's truck to Tulsa and sell it, and that Spears agreed with this plan. Powell then returned to the crime scene.

Powell, Spears, and Johnson subsequently left Thompson's body and returned to the truck. Spears told everyone to listen to Johnson, who directed them not to say anything about what had happened. Spears then told Hensley and Daniels that if anyone asked them if they had seen Thompson that evening, they should say that Thompson had taken them to a football game and dropped them off after the game.

Upon leaving the cemetery, the group first took Hensley home. The remaining four then went to the home of Johnson's girlfriend, Lashonda Austin, where Johnson told Austin that they had killed a man that night in self-defense and where Spears confirmed the killing. After leaving Austin's house, Powell and Johnson dropped off Spears and Daniels. Much later, Johnson took Powell home and eventually parked Thompson's truck at an apartment building. The following day, Johnson was arrested in a neighboring town while in possession of Thompson's truck and wallet. Spears and Powell were arrested soon thereafter. [3]

At trial, the medical examiner, Dr. Larry Balding, testified that Thompson

---

[3] Hensley and Daniels were held on a material-witness bond of twenty-five thousand dollars.

5

died from blunt-force injury to the head, resulting in a skull fracture and bleeding into and on the brain.  According to Dr. Balding, a single blow could have caused the head injury or death.  While he did not know the actual number of blows to Thompson's head, he was certain Thompson sustained more than one blunt-force blow to the body.  However, Dr. Balding did not believe that any of the blows to the body would have caused death, either individually or in combination.

Dr. Balding further testified that Thompson received fifty to sixty knife wounds to his head, neck, chest, abdomen, and back.  As a result of the stabbing, six to eight inches of Thompson's small intestine protruded.  Parts of other internal organs were visible through the chest.  Apart from what were referred to as two possible peri-mortem knife wounds, all other knife wounds were inflicted post-mortem. [4]  Any potentially fatal stab wounds were delivered post-mortem.

Neither Spears nor Powell testified or presented any evidence at the trial's first stage.  Based on the State's evidence, the jury found both guilty of first-degree murder.

The State's second-stage presentation was brief.  After incorporating all first-stage evidence, the State presented six photographs of Thompson's body

---

[4] Dr. Balding was uncertain whether a large cut on Thompson's chest where there was some hemorrhage was peri-mortem, because Thompson had received several blows to the chest region which also caused hemorrhage.  Likewise, because there was massive head trauma with bleeding, Dr. Balding was uncertain whether the stab wound to the right side of Thompson's head was peri-mortem.

6

taken at the crime scene. Spears presented two mitigation witnesses. His sister, Sharlene Flannery, testified that Spears dropped out of school in the tenth grade, that he babysat her children, that he has one child, that she never saw him fight or be so angry that he would hurt or kill someone, and that he regularly attended church. Reverend John Stiger testified that he had ministered to Spears' family and had watched Spears grow up. He stated that Spears was a normal young man with no prior convictions, who had positively influenced the lives of people in the county jail. Other mitigation evidence emphasized Spears' youth and his intoxication at the time of the crime.

Powell also presented two mitigation witnesses. His mother, Connie Walls, testified that Powell grew up without a father, experienced rejection from his family, adored his three step-siblings and helped care for them, generally stopped caring when his step-sibling twins' father kidnapped them, regularly attended church, stopped attending school in seventh grade after being held back due to his learning disabilities, loved music, and has mechanical ability. Rachel Smith, who had known Powell since he was six or seven, testified that she acted as a surrogate grandmother to him, and he minded her when asked to do so. Other mitigating factors included Powell's youth, likelihood of rehabilitation, and intoxication at the time of the crime.

Based on all of the evidence, the jury found, with respect to both Spears

7

and Powell, that Thompson's murder was especially heinous, atrocious, or cruel and that the two committed the murder to avoid arrest or prosecution. The jury, however, did not find that either would be a continuing threat to society. After weighing the two aggravators against the mitigating evidence, the jury delivered death sentences for both Spears and Powell.

The Oklahoma Court of Criminal Appeals ("OCCA") affirmed Spears' conviction and sentence on direct appeal and denied his first application for post-conviction relief. Spears v. State, 900 P.2d 431 (Okla. Crim. App.), cert. denied, 516 U.S. 1031 (1995); Spears v. State, 924 P.2d 778 (Okla. Crim. App. 1996). Spears then filed a petition for a writ of habeas corpus in federal district court. Identifying several issues as unexhausted, the district court abated federal proceedings and directed Spears to return to state court to exhaust these issues. He did so, and the OCCA denied relief on a second application for post-conviction relief. Spears v. State, No. PC-99-1099 (Okla. Crim. App. Oct. 13, 1999). Federal habeas proceedings then resumed. Granting Spears habeas relief from his death sentence, the district court held that the introduction of the crime-scene photographs at the trial's second stage deprived him of a fundamentally fair sentencing proceeding. However, the district court rejected all other second-stage arguments and denied relief from Spears' conviction.

Powell's conviction and sentence were also upheld by the OCCA, and his

8

application for post-conviction relief was similarly denied.  Powell v. State , 906 P.2d 765 (Okla. Crim. App. 1995),  cert. denied , 517 U.S. 1144 (1996);  Powell v. State , 935 P.2d 378 (Okla. Crim. App. 1997).  As with Spears, on federal habeas review, the district court granted Powell relief from his death sentence due to the constitutional error arising from admission of the photographs, but rejected all other second-stage arguments and denied relief from Powell's conviction.

The district court stayed enforcement of Spears' and Powell's judgments pending appeals.  The State, Spears, and Powell all appeal.

## II

Because Spears and Powell filed their petitions for habeas relief after April 24, 1996, the effective date of AEDPA, AEDPA's provisions apply to both appeals.  See Lindh v. Murphy, 521 U.S. 320, 326–27 (1997).  Under AEDPA, if a claim is adjudicated on the merits in state court, we will grant habeas relief to a petitioner only if he can establish that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."  28 U.S.C. § 2254(d)(1), (2).  AEDPA requires us to presume that state court factual findings are correct, and places the burden on the petitioner to rebut this presumption by clear and convincing evidence.

9

§ 2254(e)(1).

If the state court did not decide a claim on the merits, and it is not otherwise procedurally barred, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error. See Hooker v. Mullin, 293 F.3d 1232, 1237 (10th Cir. 2002), cert. denied, 123 S. Ct. 975 (2003). When, however, "the district court's findings of fact are based merely on a review of the state record, we do not give them the benefit of the clearly erroneous standard but instead conduct an independent review." Morris v. Burnett, 319 F.3d 1254, 1268 (10th Cir. 2003) (quotation and brackets omitted). We apply these standards to determine whether the district court correctly assessed each issue before us on appeal. See Darks v. Mullin, 327 F.3d 1001 (10th Cir. 2003).

## III

### A. State's Appeals

The federal district court held that the State's penalty-phase introduction of crime-scene photographs showing Thompson's mutilated body deprived Spears and Powell of a fundamentally fair sentencing proceeding as guaranteed by the Eighth and Fourteenth Amendments. On appeal, the State argues that these admittedly gruesome photographs were relevant to both the heinous, atrocious, or cruel and continuing-threat aggravators, that their relevance outweighed any danger of unfair prejudice, and that the photographs were therefore properly

10

admitted in evidence.

"Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights." Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999) (citing Estelle v. McGuire, 502 U.S. 62, 67–68 (1991)); see also Willingham v. Mullin, 296 F.3d 917, 928 (10th Cir. 2000). When, as here, habeas petitioners challenge the admission of photographic evidence as violative of the Constitution, this court considers "whether the admission of evidence . . . so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." Romano v. Oklahoma, 512 U.S. 1, 12 (1994); see also Bruton v. United States, 391 U.S. 123, 131 n.6 (1968) ("An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of [sentencing]."); Smallwood, 191 F.3d at 1275 (examining "whether the admission of the photographs rendered the proceedings fundamentally unfair"); Willingham, 296 F.3d at 928 (addressing whether admission of photographs was "so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process" (quotation omitted)). "[B]ecause a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self-restraint." Duckett v. Mullin, 306 F.3d 982, 999

11

(10th Cir. 2002) (quotations omitted); see also Bullock v. Carver, 297 F.3d 1036, 1055 (10th Cir.) (recognizing that only a narrow category of infractions violates fundamental fairness), cert. denied, 123 S. Ct. 703 (2002); Jackson v. Shanks, 143 F.3d 1313, 1322 (10th Cir. 1998) (approaching fundamental-fairness analysis with "considerable self-restraint" (quotation omitted)).

Although there are no clearly defined legal elements, the fundamental-fairness inquiry requires us to look at the effect of the admission of the photographs within the context of the entire second stage. See Duckett, 306 F.3d at 988. We consider the relevance of the photographs and the strength of the aggravating evidence against Spears and Powell as compared to the mitigating evidence in their favor and decide whether admission of the photographs could have given the State an unfair advantage. Ultimately, we consider whether the jury could judge the evidence fairly in light of the admission of the photographs. See id. at 989. Applying this fundamental-fairness standard and mindful of the standards of review set forth by AEDPA, we conclude that the federal district court appropriately granted habeas relief.

In Oklahoma, a murder is especially heinous, atrocious, or cruel if it was "preceded by torture or serious physical abuse. Torture includes the infliction of either great physical anguish or extreme mental cruelty, while physical abuse requires evidence of conscious physical suffering." Romano v. Gibson, 239 F.3d

12

1156, 1176 (10th Cir. 2001) (quotation omitted); see also Powell, 906 P.2d at 779–80 (recognizing that it is critical for the State to prove the victim's conscious physical suffering before death); Spears, 900 P.2d at 443, 449 (same).

According to the State, because Thompson was alive for part of the stabbing and three of the photographs depict his extensive head injuries, all six photographs were relevant to prove he suffered serious physical abuse prior to death. The OCCA decided the photographs were relevant and properly admitted to prove Thompson suffered serious physical abuse prior to his death, in light of testimony that Thompson moaned and suffered two peri-mortem stab wounds. Powell, 906 P.2d at 780; Spears, 900 P.2d at 443.

That Thompson suffered serious physical abuse in the common sense of the term is not in doubt. Rather, the question under Oklahoma law is whether the photographs were relevant to show conscious physical suffering. See Willingham, 296 F.3d at 929 (noting that when a "victim dies or loses consciousness early on in an assault, photographs of all of [his] injuries might involve irrelevant and/or unduly prejudicial material at the penalty phase, since the [heinous, atrocious or cruel] aggravator focuses on the conscious suffering of the victim" (citing Powell, 906 P.2d at 780)). On this point, the OCCA questioned the relevance of the photographs to the jury's finding of the heinous, atrocious, or cruel aggravator:

13

These photographs are not . . . probative of whether Thompson was conscious during the beating which is the critical inquiry in determining whether a murder was especially heinous, atrocious or cruel. The probative value of these photographs is very slight especially in light of their gruesome nature. Their probative value scarcely exceeds their prejudicial effect. We note the introduction of the six photographs came very close to causing a second sentencing hearing given the paucity of evidence supporting the aggravator especially heinous, atrocious or cruel. Because such photographs were not admitted in first stage, they were more shocking seen for the first time in the punishment stage.

Spears, 900 P.2d at 443 (emphasis added); see Powell, 906 P.2d at 780 (setting forth identical reasoning). Despite concerns about the photographs, however, the OCCA decided that their probative value outweighed their prejudicial effect. Powell, 906 P.2d at 780; Spears, 900 P.2d at 443.

Contrary to the OCCA, the federal district court held that the photographs denied Spears and Powell a fundamentally fair sentencing proceeding because the photographs' prejudicial effect outweighed their probative value:

None of the stab wounds focused on in the photographs can be considered probative of the question of conscious physical suffering, the only injuries arguably being relevant to such a determination being those from the beating. While the jury was not instructed that it had to find "conscious physical suffering," it was instructed it had to find the victim's death was preceded by torture or serious physical abuse. . . . Because none of the stab wounds occurred while the victim was conscious or preceded his death, such injuries cannot be considered relevant to the question before the jury.

Spears v. Gibson, No. CIV-96-1862-M, slip op. at 44–45 (W.D. Okla. Oct. 15, 2001); Powell v. Ward, No. CIV-97-516-M, slip op. at 63 (W.D. Okla, Aug. 22,

14

2001).  This improper evidence, along with the lack of evidence of conscious physical suffering during the beating, caused the district court to conclude that the second-stage proceedings were unconstitutionally infirm. [5]

Having viewed the photographs and reviewed the entire record, we agree with the district court that the introduction into evidence of the photographs depicting Thompson's numerous post-mortem stab wounds, large gash wounds, exposed intestines and swollen face and black eye rendered the second stage fundamentally unfair.  Because the heinous, atrocious, or cruel aggravator focuses on Thompson's conscious suffering, and the evidence showed Thompson died or lost consciousness early on in the beating, the photographs of all of his injuries were unduly prejudicial at the second phase.  See Willingham, 296 F.3d at 928–29 (citing Powell, 906 P.2d at 780).  Instead, the gruesome photographs potentially misled the jury, as they necessarily had a strong impact on the jurors' minds.  Minimal evidence suggested Thompson was conscious or even alive during the stabbing. [6]  At most, two of the fifty to sixty stab wounds were peri-mortem.

---

[5]  The federal district court did find exhibit 50, showing Thompson's black eye and swollen face, to be probative of whether he endured physical abuse before death, if he was conscious during the beating.  However, even if this one photograph did not render the trial fundamentally unfair, we conclude the others did.

[6]  We note that the OCCA stated that there was a "plethora of evidence Thompson endured serious physical anguish prior to death." Spears, 900 P.2d at 449; Powell, 906 P.2d at 782.  In the next sentence, however, the court states, "Further, there

(continued...)

Neither the peri-mortem stab wounds nor conscious suffering were connected to the specific photographs. The photographs do not show any defensive wounds, nor do they support, clarify, or illustrate any testimony indicating Thompson consciously suffered physical abuse before his death. See Jackson, 143 F.3d at 1322; Hoxsie v. Kerby, 108 F.3d 1239, 1243 (10th Cir. 1997).

Even if the photographs were minimally relevant to the heinous, atrocious, or cruel aggravator, the photographs' prejudicial effect outweighed their probative value. Important to this conclusion is the fact that the State waited until the second stage to introduce the photographs. By contrast, the State introduced comparatively innocuous photographs at the first stage, seeming to deliberately await the second stage to present the more gruesome photographs solely for their shock value. Because the photographs were the primary aggravating evidence specifically presented at the second stage, they constitute a major part of the State's second-stage case.

---

[6](...continued)
was evidence Thompson was conscious during the beating," suggesting that the previous sentence was not meant to describe the evidence of conscious suffering. Spears, 900 P.2d at 449; Powell; 906 P.2d at 782. Earlier, the court stated that there was a "paucity of evidence supporting the [heinous, atrocious, or cruel] aggravator." Spears, 900 P.2d at 443; Powell, 906 P.2d at 780. In any event, had the OCCA determined there was a plethora of evidence of conscious suffering, our review of the record leads us to conclude that such a finding would be unreasonable. We agree with the district court that the evidence offered to show conscious suffering was weak.

As the OCCA observed, and as set forth above, a paucity of evidence supported the heinous, atrocious, or cruel aggravator. See Powell, 906 P.2d at 780; Spears, 900 P.2d at 443. As to the "avoid arrest or prosecution aggravator" found by the jury, while there was some evidence to support the aggravator, we agree with the district court that such evidence was not particularly strong. [7] When viewed together with the mitigation evidence presented by Spears' and Powell's respective trial counsel, including evidence of Spears' and Powell's youth, intoxication at the time of the crime and their lack of prior criminal history, we conclude that such evidence was not sufficiently strong standing alone such that the jury would have returned a sentence of death.[8]

---

[7] As the district court noted:

> While Hensley and Daniels did testify that a conversation occurred on the way to the cemetery regarding taking the victim's truck, a full reading of the record also supports [Spear's] theory that the motive for the killing was Powell's anger towards the victim on the evening of the murder. Furthermore, the evidence that Johnson was the one primary interested in disposing of the truck and selling it after the murder lends some support to [Spears'] theory as to the motive for the killing.

Spears v. Gibson, No. CIV-96-1862-M, slip op. at 47–48 (W.D. Okla. Oct. 15, 2001); Powell v. Ward, No. CIV-97-516-M, slip op. at 66 (W.D. Okla. Aug. 22, 2001).

[8] As noted above, the State argues that the six photographs were relevant to both the heinous, atrocious, or cruel and continuing-threat aggravators. The OCCA did not consider the relevance of the photographs to the continuing-threat aggravator. See Powell, 906 P.2d at 779–80; Spears, 900 P.2d at 443. Our review of the

(continued...)

17

This highly inflammatory evidence fatally infected the trial and deprived Spears and Powell of their constitutional rights to a fundamentally fair sentencing proceeding. The OCCA's decision that the photographs' relevance exceeded their prejudice was objectively unreasonable, see 28 U.S.C. § 2254(d); see also Woodford v. Visciotti, 123 S. Ct. 357, 360 (2002) (requiring a habeas applicant to show that the state court applied Supreme Court law to the facts in an objectively unreasonable manner and distinguishing unreasonable and incorrect applications of law), and we conclude that the district court correctly decided that the photographs rendered the second stage of trial fundamentally unfair. [9] To the

---

[8](...continued)
record shows that while the primary focus of the prosecution's arguments during the second stage was the relevance of the photographs to the heinous, atrocious, or cruel aggravator, the prosecution did implicitly link the contents of the photographs with its argument on the continuing-threat aggravator. However, even assuming that the photographs were relevant to the continuing threat aggravator, we conclude that the prejudicial effect of the photographs, as described above, outweighs the probative value of this evidence.

[9] After determining that the photographs caused the trial to be fundamentally unfair, the federal district court then proceeded to conduct a harmless-error analysis. This was unnecessary. The "substantive prejudice component[]" inherent in fundamental-fairness review "essentially duplicate[s] the function of harmless-error review." Cargle, 317 F.3d at 1207. Thus, once a showing of fundamental unfairness is made, a petitioner is entitled to habeas relief without an assessment of harmless error. Id.; see, e.g., Wainwright v. Greenfield, 474 U.S. 284, 285, 289, 295 (1986) (holding that the use of defendant's silence was fundamentally unfair and warranted a new trial); Gonzales v. Lytle, 167 F.3d 1318, 1321 (10th Cir. 1999) (holding that a failure to permit the jury to consider recanted testimony rendered the trial fundamentally unfair, warranting habeas relief).

18

extent that the OCCA implicitly determined that the admission of the photographs

did not render the second stage fundamentally unfair, we conclude that this was

an unreasonable application of clearly established Supreme Court precedent. [10]

_____

[10] Spears and Powell also argue that (1) the heinous, atrocious, or cruel aggravator is not constitutionally valid, because the jury did not receive instruction on the conscious suffering requirement; (2) insufficient evidence supported a finding of the heinous, atrocious, or cruel aggravator; and (3) insufficient evidence supported the avoid-arrest aggravator. Because we affirm the district court's grant of habeas relief with respect to the unconstitutional admission of the photographs, we need not reach the first argument. As to the second and third arguments, we need not reach the question of whether there was sufficient evidence to support every aggravator. However, in order to allay any Double Jeopardy concerns, we must determine whether there was sufficient evidence to support at least one aggravator. See Poland v. Arizona, 476 U.S. 147, 156 (1986) (holding that only a finding "that no aggravating circumstance is present is an acquittal barring a second death sentence proceeding" (quotation omitted)); see also Cargle v. Mullin, 317 F.3d 1196, 1225 (10th Cir. 2003) (applying Poland to the Oklahoma death-penalty scheme).

In reviewing petitioners' claims, the OCCA concluded that there was sufficient evidence to support the avoid arrest or prosecution aggravator. In regard to Spears, the OCCA reasoned that

> In the instant case the evidence showed Spears and Powell discussed beating Thompson and taking his truck before they arrived at the cemetery. At the cemetery Powell told Spears he would initiate the beating and advised Spears and Johnson to join in. Spears and Powell then carried out their plan to beat and rob Thompson. After administering the severe beating, Spears grabbed Powell and Johnson by the arm, produced a knife and said they had to kill Thompson because he could testify against them. After stabbing Thompson, Spears, Powell and Johnson took Thompson's truck and wallet and made plans to dispose of them along with Spears' knife. Spears told Hensley she better tell the alibi story he concocted or they would all "get in trouble for all this." From this evidence a rational jury could find Spears had motive to rob Thompson, stopped at the cemetery to commit the robbery, voluntarily joined in the beating and stabbing of
> (continued...)

19

See, e.g. , Romano, 512 U.S. at 12; Donnelly v. DeChristoforo , 416 U.S. 637, 643 (1974); Bruton, 391 U.S. at 131 n.6.

### B. Spears' and Powell's Cross-Appeals:

### 1. Bruton Error and Failure to Sever

Both Spears and Powell argue that the trial court improperly admitted out-of-court statements that each of them made implicating the other, in violation of

---

[10](...continued)

> Thompson to avoid arrest for the theft of Thompson's truck, took Thompson's truck and wallet and directed disposal of the incriminating evidence.

Spears, 900 P.2d at 447–48. In regard to Powell, the OCCA reasoned that

> In the instant case the evidence showed Powell and Spears discussed beating Thompson and taking his pickup truck before they arrived at the cemetery. At the cemetery Powell told Spears, Johnson and Daniels he would initiate the beating and then they should join in. Powell then carried out his plan and struck Thompson. Powell confessed "they" decided to steal Thompson's pickup and to kill him. After the murder Powell participated in discussions about selling Thompson's pickup in Tulsa and disposing of Thompson's wallet and the knife. From this evidence a rational jury could find Powell had motive to rob Thompson, stopped at the cemetery to commit the robbery, initiated the beating, killed Thompson to avoid arrest for the theft of the truck, took Thompson's truck and wallet and helped dispose of incriminating evidence.

Powell, 906 P.2d at 781.

We agree with the district court that the OCCA's determination that there was sufficient evidence to support the avoid-arrest-or-prosecution aggravator was not an unreasonable application of Jackson v. Virginia, 443 U.S. 307 (1979). Thus, we need not consider whether there was sufficient evidence to support the remaining two aggravators. See Cargle, 317 F.3d at 1225.

their constitutional rights to a fair trial and to confrontation. See Bruton v. United States, 391 U.S. 123 (1968). Additionally, both argue that introduction of these statements resulted in a constitutionally unfair trial, and, therefore, the trial court should have severed their trials. [11] Because Spears and Powell base their severance claims on the Bruton errors, we first address the Bruton claims and then the severance claims.

### a. Bruton

In Bruton, the Supreme Court held that

> a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant.

Richardson v. Marsh, 481 U.S. 200, 201–02 (1987); see also id. at 207; Cruz v. New York, 481 U.S. 186, 187–88 (1987). Bruton applies, however, only if the statement expressly implicates the defendant. See Richardson, 481 U.S. at 208. "Richardson allows a court, despite the Confrontation Clause, to admit the confession of a non-testifying co-defendant [that does not expressly implicate the defendant]. The confession must be (i) redacted to eliminate any reference to the non-confessing defendant, and (ii) accompanied by an appropriate limiting

---

[11] Powell raised the severance and Bruton claims as separate issues, whereas Spears treated them as a single issue. Nonetheless, both make similar claims, thereby making it appropriate for us to consider their arguments together.

21

instruction that the confession is to be considered only against the confessor." Fowler v. Ward, 200 F.3d 1302, 1307 (10th Cir. 2000) (citing Richardson, 481 U.S. at 211), overruled on other grounds by Moore v. Marr, 254 F.3d 1235, 1239 (10th Cir. 2001). "This is clearly a two-pronged requirement; a redaction, no matter how perfect, nevertheless requires an appropriate limiting instruction immediately following the admission of the confession." Id.

### i.  Spears

Under Bruton, Spears first challenges Officer Wigley's testimony concerning Powell's statement. Officer Wigley testified as follows:

A [Powell [12]] said that he had been riding around Pauls Valley drinking with some others.

Q  Did he name those others?

A  Yes, he did.

Q  Okay.  That's fine.

A  And they had been riding around Pauls Valley drinking, and they had picked up various riders at different locations.  And that they ended up at the Klondike Cemetery at the cattle guard and gate area, at the road leading up to the cemetery.

\*\*\*

A  He said that they got out of the pickup at the gate and stood around drinking there for a little while.  Then they proceeded to walk up the road which leads to the cemetery.  After they had traveled some distance, he decided that he would whip [Thompson's] ass or

---

[12]  In his testimony, Officer Wigley referred to Powell, Thompson, and Johnson by their first names.

22

kick . . . [Thompson's] ass.

***

A  At which time [Powell] then struck [Thompson] in the face.  And [Thompson] went to the ground, at which time he began to kick and stomp [Thompson] along with the others.  They–they beat him for sometime.  I'm not sure of the time that they were there beating on him.

Then they walked away from the body.  And [Powell] said that it was decided they would steal the pickup, and that they were going to have to kill [Thompson].  They returned to the body, at which time a knife had been produced, and that [Johnson] took the knife and began stabbing [Thompson].

(4 Tr. at 1113–14.)  Thus, in paraphrasing Powell's out-of-court statement, Officer Wigley made general reference to the group involved in the murder but did not mention Spears by name.

Spears argues that given that:  (1) both Hensley and Daniels had testified and identified Spears as one of those persons who participated in the crime prior to Officer Wigley's testimony, and (2) Johnson testified immediately after Officer Wigley and named Spears as part of the group, Officer Wigley's references to "others" and "they" were transparent, making it obvious that Officer Wigley was referring to him.

Because Powell's statement, as presented by Officer Wigley, was not incriminating on its face, and became incriminating only after it was linked to evidence introduced before and after Officer Wigley's testimony,        see Richardson , 481 U.S. at 208, admitting Powell's statement did not violate        Bruton  principles if

23

the statement was properly modified to eliminate any reference to Spears and the trial court gave an appropriate limiting instruction. See Fowler, 200 F.3d at 1307 (citing Richardson, 481 U.S. at 211).

As the above-quoted testimony shows, Officer Wigley paraphrased Powell's statement to eliminate any reference to Spears by using the neutral pronouns "others" and "they." Although the Supreme Court has "express[ed] no opinion on the admissibility of a confession in which the defendant's name has been replaced with a . . . neutral pronoun[,]" Richardson, 481 U.S. at 211 n.3, this court has held that neutral pronouns are proper, if a defendant's incrimination is by reference to evidence other than the modified statement and the jury receives a proper limiting instruction. See United States v. Verduzco-Martinez, 186 F.3d 1208, 1214 (10th Cir. 1999); United States v. Green, 115 F.3d 1479, 1484–85 (10th Cir. 1997); see also Gray v. Maryland, 523 U.S. 185,194-96 (1998) ( recognizing that proper modification incriminates inferentially and does not point directly to defendant). Because Officer Wigley did not mention Spears by name or description, any inference connecting Spears to the statement could be made only after considering additional evidence. See Verduzco-Martinez, 186 F.3d at 1214. Thus, Powell's statement was properly modified by Officer Wigley.

Despite the proper modification, however, Spears correctly argues that the trial court failed to give a proper limiting instruction after admitting Officer

24

Wigley's paraphrase of Powell's confession. We agree that this failure resulted in constitutional error. See Fowler, 200 F.3d at 1307. The general instruction given at the end of the trial charging the jury to give separate consideration to each defendant was insufficient to satisfy Richardson. Id. at 1307. "The Richardson limiting instruction must be given immediately following the introduction of the co-defendant's confession to safeguard against inappropriate use of the confession against the non-confessing co-defendant." Id.

When faced with a Bruton error, harmless-error analysis applies to decide entitlement to relief. Harmless error is assessed "in the context of the entire case." Lee v. Illinois, 476 U.S. 530, 547 (1986); cf. Fowler, 200 F.3d at 1307 (pre-AEDPA) (assessing harmless error under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). The OCCA decided that any Bruton error was harmless, [13] and we conclude that this holding was not contrary to or an unreasonable application of Chapman v. California, 386 U.S. 18, 24 (1967). [14] See Spears, 900 P.2d at 444

_____

[13] Although the OCCA decided that Powell's statement, as modified, did not incriminate Spears, it did not address whether the trial court gave an appropriate limiting instruction. See Spears, 900 P.2d at 444. Instead, assuming the statement was incriminating, the OCCA proceeded to consider harmless error. See id.

[14] The federal district court relied on Brecht in assessing harmless error. We have held that federal courts do not review based on Brecht when the OCCA has applied the harmless-beyond-a-reasonable-doubt standard set forth in Chapman. See Willingham, 296 F.3d at 927 n.4. Here, there is a state-court-Chapman determination to defer to under 28 U.S.C. § 2254(d). Thus, we must decide

(continued...)

(applying without citing Chapman); 28 U.S.C. § 2254(d)(1). Our review of the record reveals nothing that would demonstrate actual prejudice. Officer Wigley made no reference to Spears in restating Powell's confession. More importantly, Powell's statement was not vitally important to the State's case against Spears. Rather, other independent evidence pointed to Spears' involvement in the murder. Three eye-witnesses—Hensley, Daniels and Johnson—testified about Spears' participation in beating Thompson. Johnson testified about Spears' participation in the later stabbing. Therefore, the erroneously admitted statement was merely cumulative to other uncontroverted evidence that was properly before the jury. See Brown v. United States, 411 U.S. 223, 231 (1973). Furthermore, this case was not so complex that the jury could not fairly evaluate the evidence against each co-defendant. Nor would the jury have found the State's case significantly less persuasive had Officer Wigley's testimony been excluded. See Schneble v. Florida, 405 U.S. 427, 432 (1972).

Spears also argues that the testimony of Hensley and Daniels, implicating him in the murder, violated Bruton. Specifically, he objects to Hensley's testimony that Powell asked the group, including Spears, who was going to hit Thompson, and to Daniels' testimony concerning a conversation about the

---

[14](...continued)
whether the state court's finding of harmless error was contrary to or an unreasonable application of Chapman.

26

stabbing that Daniels had with Powell while the two were in jail. Daniels'

testimony, according to Spears, was the only evidence corroborating Johnson's

testimony concerning the stabbing.

Recognizing that Hensley's and Daniels' testimony relating Powell's

statements, which inculpated Spears, should not have been admitted, the OCCA

nonetheless concluded that any error was harmless beyond a reasonable doubt

because "other evidence" showed Spears' participation in the crime. Spears, 900

P.2d at 444 (applying without citing Chapman). Assuming these statements

violated Bruton, we conclude that the OCCA's harmless-error determination was

not contrary to or an unreasonable application of Chapman.[15] See 28 U.S.C.

§ 2254(d)(1).

Spears argues that admission of these statements was not harmless error

because the "other evidence" to which the OCCA refers came from Hensley and

Johnson, and was not credible. Specifically, Spears contends Johnson had a deal

with the prosecutor and Hensley's preliminary-hearing testimony differed from

her trial testimony because she and the prosecutor reached a deal resulting in her

release from jail. On this point, we note that the jury received sufficient

information to evaluate the credibility of both Hensley's and Johnson's testimony.

---

[15] Again, we note that the district court incorrectly assessed harmless error under the Brecht standard.

Hensley informed the jury that she had been required to post a material-witness bond, and that the bond had been drastically reduced. She testified that the State had given her no incentive to testify and that she had lied in her prior written statements and during her preliminary-hearing testimony to cover up for her then-boyfriend Spears. She knew she could yet be charged with perjury for giving false statements. Moreover, she admitted at trial that she had just remembered that Spears and Powell had talked in the truck on the way to the cemetery about beating Thompson and taking his truck. Lastly, she informed the jury of her confinement and later release from jail. Similarly, Johnson fully informed the jury about the plea agreement, enabling the jury to evaluate the credibility of his testimony. In sum, when taken in the context of the entire trial, any agreement that Johnson and Hensley may have had with the prosecution does not establish that any assumed Bruton error was harmful. Hensley, Daniels and Johnson all testified consistently about the murder, and their testimony was uncontroverted.

As a final argument, Spears contends that the cumulative effect of the Bruton errors identified by the OCCA deprived him of a fair trial. [16] Spears did not raise this claim in state court. However, because the State does not contend that this claim is procedurally barred, we consider Spears' argument on its merits.

---

[16] Because we affirm the grant of habeas relief from Spears' sentence, we need not decide Spears' argument that failure to sever affected the trial's second stage.

See Hooks v. Ward, 184 F.3d 1206, 1216–17 (10th Cir. 1999) (recognizing that the State bears the burden of asserting procedural default). We may deny relief on the merits of a claim even if that claim has not been exhausted in state court. See 28 U.S.C. § 2254(b)(2).

Although each of the individual Bruton errors was harmless, "the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." Duckett, 306 F.3d at 992 (quotation omitted). "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Id. (quotation omitted). We conclude that the Bruton errors, even when accumulated, did not have a sufficiently prejudicial effect to deny Spears a fair trial. Strong, consistent evidence supported his conviction.

### ii. Powell

Powell argues that he was deprived of his right to a fair trial and his right to confront witnesses by the State's introduction of Spears' out-of-court statement. See Bruton, 391 U.S. at 126. Specifically, Powell objects to Johnson's testimony that Spears told Johnson and Powell that they had to kill

29

Thompson because he could testify against them.[17]

Concluding that the statement should not have been admitted as it violated Bruton,[18] the OCCA nevertheless held that any error was harmless beyond a reasonable doubt because the properly admitted evidence was overwhelming and the prejudicial effect of the statement was insignificant. Powell, 906 P.2d at 772–73 (citing, e.g., Cruz, 481 U.S. 186). In reaching this conclusion, the court noted:

> Powell admitted he had decided to "kick [Thompson's] ass." He admitted he beat, kicked and stomped Thompson with the others. Powell admitted after the beating it was decided that they would have to kill Thompson. Given Powell's confession and the testimony of the other witnesses, it is inconceivable the admission of Spears' statement contributed to the verdict.

Id. at 773. Assuming a Bruton error, we conclude, in light of the substantial other evidence presented, that the OCCA's harmlessness determination was not contrary

---

[17] In light of our affirmance of the district court's grant of habeas relief, we need not address Powell's contention that the State improperly relied on this challenged statement to prove he committed the murder to avoid arrest and prosecution. Nor do we reach Powell's argument that the failure to sever also affected the trial's second stage.

[18] The OCCA noted Johnson's testimony that Spears told him and Powell that they had to kill Thompson so that Thompson could not testify against them was "an atypical Bruton problem because the statement was made to two other co-defendants rather than the police and does not directly implicate Powell." Powell, 906 P.2d at 772. Recognizing the statement is circumstantial evidence of intent to murder, the court decided the statement fell within the parameters of Bruton. Id. at 772–73.

to or an unreasonable application of Chapman.[19]  See 28 U.S.C. § 2254(d)(1).

### b.  Severance

Spears and Powell both argue that the trial court violated their constitutional right to a fair trial by failing to sever their trials.  As evidence of the prejudice resulting from the failure to sever, both point to the Bruton errors discussed above.  In reviewing these claims, we are mindful that "[w]hether the trial court erred in denying severance is generally a question of state law that is not cognizable on federal habeas appeal, . . . for a criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by the joint trial."  Cummings v. Evans, 161 F.3d 610, 619 (10th Cir. 1998).  "Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant . . . might present a risk of prejudice."  Zafiro v. United States, 506 U.S. 534, 539 (1993) (citing Bruton).  A Bruton problem alone, however, is insufficient to require severance.  See United States v. Hill, 901 F.2d 880, 883 (10th Cir. 1990).

Because, as discussed above, any Bruton error was harmless, the joint trial did not prejudice Powell or Spears.  Even if there were a risk of prejudice, the trial court properly instructed the jury that:  (1) the State had the burden of

---

[19]  As previously noted, the federal district court incorrectly relied on Brecht in assessing harmless error.

proving beyond a reasonable doubt that both Spears and Powell committed first-degree murder; (2) the jury must give separate consideration to each individual defendant; and (3) the jury should draw no inferences from Powell's and Spears' decision not to testify. "These instructions sufficed to cure any possibility of prejudice." Zafiro, 506 U.S. at 541 (considering severance under Fed. R. Crim. P. 14). Thus, neither Powell nor Spears can establish prejudice so severe that they were denied their right to a fair trial. Accordingly, the OCCA's decisions upholding the joint trial were not unreasonable. See Powell, 906 P.2d at 773; Spears, 900 P.2d at 444; see also 28 U.S.C. § 2254(d)(1).

## 2. Unanimous Guilty Verdict and Sufficiency of the Evidence

Spears and Powell argue that they were denied their constitutional right to a unanimous jury verdict. The Bindover Information alternatively charged them with two counts: first-degree malice murder and first-degree felony murder. Although the trial court instructed the jury on the need for a unanimous verdict, the court did not instruct the jury that its verdict must be unanimous on one count or the other. Furthermore, the verdict form did not distinguish between the two alternative counts and therefore did not indicate whether the jury believed Spears and Powell committed first-degree-malice or felony murder or both. Thus, Spears and Powell both contend that there was no unanimous verdict on either malice or felony murder, and because insufficient evidence supported both murder theories,

32

the lack-of-a-unanimous-verdict problem remained.

### a. Unanimous Guilty Verdict

While Spears and Powell acknowledge that the Supreme Court has held that a non-unanimous first-degree-murder verdict under similar circumstances does not violate the Constitution, Schad v. Arizona, 501 U.S. 624, 627, 645 (1991) (plurality opinion), they nonetheless argue that their cases present extreme examples not covered by Schad. Further, they contend Schad does not square with the Supreme Court's holdings in Apprendi v. New Jersey, 530 U.S. 466 (2000), that a jury must find all elements of a crime, or In re Winship, 397 U.S. 358, 364 (1970), that proof must be beyond a reasonable doubt. [20]

Despite wishful thinking to the contrary, Schad is controlling. This court has explained that "Oklahoma statutes have long defined the offense of 'murder' or 'first degree murder' as encompassing both malice aforethought murder and felony murder. Consistent therewith, the OCCA has characterized malice

---

[20] We need not consider Spears' and Powell's argument that Apprendi changes this result because Apprendi does not apply retroactively. See United States v. Mora, 293 F.3d 1213, 1219 (10th Cir.), cert. denied, 123 S. Ct. 388 (2002). Even were we to consider this argument on its merits, we would conclude that Apprendi does not change the result. Apprendi held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Here, the State charged Spears and Powell with, and the jury found them guilty of, first-degree murder, after finding that the State proved that crime beyond a reasonable doubt. Apprendi does not indicate in any way that it overrules Schad.

aforethought murder and felony murder as different theories for the same general offense of first degree murder." Hain v. Gibson, 287 F.3d 1224, 1232 & n.5 (10th Cir. 2002) (recognizing this is consistent with Schad) (footnote and citation omitted), cert. denied, 123 S. Ct. 993 (2003); see Williamson v. Ward, 110 F.3d 1508, 1523 (10th Cir. 1997) (citing Schad and holding that there was no deprivation of a constitutional right under similar factual circumstances). Accordingly, we conclude that the OCCA reasonably decided that although "the jury was not instructed to find unanimously that [they] had committed first degree murder either with malice aforethought or during the course of armed robbery," Powell, 906 P.2d at 775; Spears, 900 P.2d at 441, Spears and Powell were not denied due process. [21]

Spears and Powell next challenge the OCCA's determination that the instructions actually required proof of both first-degree-murder alternatives.

---

[21] The OCCA decided that Spears and Powell had waived all but plain-error review and therefore the due process issue was not properly preserved for review. Powell, 906 P.2d at 775; Spears, 900 P.2d at 441. Even if the issue had been properly preserved, the court held that there was no due process violation when the verdict did not indicate whether the jury found first-degree malice murder or first-degree felony murder because the indictment charged a single crime of first-degree murder and also because the State proved both malice and felony murder. Powell, 906 P.2d at 775–76; Spears, 900 P.2d at 442. Because the state court denied relief on the merits of the federal claim on plain-error review, procedural-bar principles do not apply. See Cargle, 317 F.3d at 1206. Thus, the state-court disposition is entitled to deference under AEDPA due to this "form of merits review." Id.

34

Powell, 906 P.2d at 775 n.11; Spears, 900 P.2d at 441 n.11; see also Romano v. State, 909 P.2d 92, 121 (Okla. Crim. App. 1995) (presuming that the jury found evidence sufficient to support both malice and felony murder where defendant was charged alternatively with malice and felony murder and there were no separate verdict forms for each type of murder). We need not address this challenge to the jury instructions, because, as discussed below, sufficient evidence supported a finding of each type of first-degree murder.

Lastly, Powell adds to this argument the claim that he was never charged with an underlying felony and therefore there is no proof he was guilty of robbery with a dangerous weapon. [22] According to Powell, this precludes a conviction for felony murder. Although Powell did not raise this issue on direct appeal, we consider and reject this claim on its merits. See 28 U.S.C. § 2254(b)(2) (permitting denial of relief on merits of unexhausted claim); Hooks, 184 F.3d at 1216–17 (requiring State to argue procedural bar).

Powell fails to cite Oklahoma authority, and we find none, establishing that he must be charged with an underlying felony in order to be charged with or

---

[22] Powell argues that his death sentence was constitutionally impermissible because the jury could have convicted him of felony murder as merely an accomplice to the robbery with a dangerous weapon, citing Tison v. Arizona, 481 U.S. 137 (1987), and Enmund v. Florida, 458 U.S. 782, 797 (1982). Because we affirm the district court's grant of habeas relief from Powell's sentence, we need not address this argument.

35

found guilty of felony murder. Although the Bindover Information did not charge Powell with an underlying felony, in charging felony murder, it did clearly allege robbery and provided relevant facts. (  See O.R. at 1.)  Specifically, it alleged that Powell was "engaged in committing the crime of Robbery by Force" "by wrongfully taking and carrying away" the victim's truck and billfold, which were in the victim's possession and immediate presence, "without [the victim's] consent and against his will" "by means of force and violence" at the time Powell, Spears and Johnson killed the victim. (  Id.; see also id. at 118 (indicating that the underlying felony is "Robbery With A Dangerous Weapon" in first stage Instructions 14 and 15))  . We conclude that this gave Powell sufficient notice of the underlying felony.

### b. Sufficiency of the Evidence

Spears and Powell argue that insufficient evidence existed to support a finding of either malice murder or felony murder. It is settled that habeas petitioners may challenge the sufficiency of the evidence in federal habeas corpus proceedings. See Torres v. Mullin , 317 F.3d 1145, 1151 (10th Cir. 2003);  see also Jackson v. Virginia , 443 U.S. 307, 322 (1979) ("A challenge to a state conviction brought on the ground that the evidence cannot fairly be deemed sufficient to have established guilt beyond a reasonable doubt states a federal constitutional claim."). "[V]iewing the evidence in the light most favorable to the

36

[State]," we will grant habeas relief only if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 319, 324. The Jackson standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. at 319.

We review sufficiency of the evidence as a question of law. See Griffin v. United States, 502 U.S. 46, 58–59 (1991) (indicating that insufficiency of proof is legal error); see also Torres, 317 F.3d at 1151–52 (viewing, under circumstances of that case, sufficiency of evidence as a legal question). Under AEDPA, our review is limited to deciding whether the OCCA's decisions that there was sufficient evidence to support a jury's finding of both malice murder and felony murder for both Spears and Powell were contrary to or an unreasonable application of Jackson. See 28 U.S.C. § 2254(d)(1); Powell, 906 P.2d at 773–75; Spears, 900 P.2d at 438–40.

Oklahoma law provides the substantive elements of malice and felony murder applicable to the sufficiency of the evidence standard. Torres, 317 F.3d at 1152; see also Jackson, 443 U.S. at 324 n.16. In relevant part, the Oklahoma first-degree murder statute provides:

> A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external

37

circumstances capable of proof.

> A person also commits the crime of murder in the first degree, regardless of malice, when that person or any other person takes the life of a human being during, or if the death of a human being results from, the commission of . . . robbery with a dangerous weapon . . . .

Okla. Stat. tit. 21, § 701.7A & B.

Additionally, Oklahoma designates as principals persons who aid and abet the commission of a murder. Id. § 172.

> The Oklahoma Court of Criminal Appeals has specified that in order to convict an aider and abetter as a principal in a first degree murder prosecution, the prosecution must prove: (1) that the defendant personally intended the death of the victim; and (2) that the defendant aided and abetted with full knowledge of the perpetrator's intent. [A]iding and abetting involves acts, words or gestures encouraging the commission of the offense, either before or at the time of the offense. [M]ere mental assent to or acquiescence in the commission of a crime by one who did not procure or advise its perpetration, who takes no part therein, gives no counsel and utters no word of encouragement to the perpetrator, however wrong morally, does not in law constitute such person a participant in the crime.

Wingfield v. Massie, 122 F.3d 1329, 1332 (10th Cir. 1997) (quotations and citations to OCCA cases omitted); see also Torres, 317 F.3d at 1152–53. In assessing intent on sufficiency of the evidence review, this court recognizes,

> [f]irst, a jury is permitted to draw inferences of subjective intent from a defendant's objective acts. Thus, even when a defendant . . . denies having the requisite intent, a jury may disbelieve the defendant if [the defendant's] words and acts in the light of all the circumstances make [the defendant's] explanation seem improbable. Second, a jury is permitted to find that a defendant intends those consequences which he announces a desire to accomplish.

38

Wingfield , 122 F.3d at 1333 (quotation and citations omitted);      see also  Torres ,

317 F.3d at 1153.

### i.      Spears and Malice Murder

Spears argues that there was insufficient evidence to support a

malice-murder conviction because all of the direct evidence of his intent to kill

came after Thompson was already dead.      Applying the Jackson standard, the

OCCA concluded that the evidence was sufficient to support the jury's finding

that Spears aided and abetted Powell in the commission of malice murder.

Spears, 900 P.2d at 438–39 (applying but not citing Jackson); see also Woodford,

123 S. Ct. at 360 (presuming that state courts know and follow the law and giving

the state-court decision the benefit of the doubt under AEDPA); Torres, 317 F.3d

at 1152 n.3 (assuming that the OCCA applied Jackson even though the court did

not cite it).  In light of evidence that Spears believed Thompson was alive at the

time he said that he, Powell, and Johnson needed to kill Thompson, and both

Powell and Daniels heard noises coming from Thompson during the beating, the

OCCA concluded that the jury could have found that Thompson was still alive at

the time Spears entered the attack and Spears' blows therefore contributed to

Thompson's death.  Spears, 900 P.2d at 438–39.  The OCCA stated that

> there was evidence Spears knew Powell was going to beat
> Thompson and was present when Powell told Johnson and
> Daniels to join in after he landed the initial blow.  According
> to Hensley, Daniels and Johnson, Spears willingly joined in the

39

> attack on Thompson and beat, stomped and kicked him with Johnson and Powell. Spears' actions belie his assertion that he did not aid and abet in the murder of Thompson. As we said in *Dumire v. State*, 758 P.2d 829, 830-31 (Okla. [Crim. App.] 1988), "[i]t is irrelevant that the defendant may not have actually struck the fatal blow. His voluntary participation and cooperation in the attack established [his] guilt as an equally culpable principal."

Id. at 439.

Our review of the trial record supports the OCCA's decision. Spears anticipated and participated in a sustained attack against a helpless victim, who did not provoke the fatal attack. Spears, Powell and Johnson repeatedly jumped on and kicked Thompson's head and body for at least three minutes, leaving Thompson's body next to the road at the cemetery. Johnson testified that, although they did not start beating Thompson with the intent to kill, at some point they developed the intent to kill and knew what they were doing. Moreover, Spears was aware that they risked killing Thompson, and Daniels testified that he thought at some point Thompson would die from the beating. See Hooks v. State, 862 P.2d 1273, 1280 (Okla. Crim. App. 1993) (holding that where the victim was a target of a sustained and relentless attack, and the victim received multiple injuries, circumstantial evidence was sufficient to prove that the defendant, at some point during the attack, formed the intent to kill the victim).

After the beating took place, Spears' intent to kill became yet more apparent. Spears said that they had to kill Thompson, because he could testify

40

against them. Spears provided the knife to stab Thompson, and there was evidence that Thompson was alive at the time the stabbing began. Johnson testified that when he first stabbed Thompson, blood squirted and hit him in the eye, suggesting the presence of blood pressure. Powell verified that Thompson was breathing right before Spears, Johnson and Powell stabbed him. Furthermore, the medical examiner testified that two of the stab wounds may have been peri-mortem. Additional evidence showed that Spears provided Hensley and Daniels with an alibi story, and Spears never expressed remorse after the killing. See Wingfield , 122 F.3d at 1333.

Viewing the evidence in its totality, we conclude that there was considerable evidence of Spears' involvement in Thompson's murder. Given this evidence, we cannot conclude that the OCCA's application of Jackson was objectively unreasonable. [23] See Torres , 317 F.3d at 1156; see 28 U.S.C.

_____

[23] Spears asserts that the OCCA altered the requirements for aider-and-abetter liability in his case. At the time of Spears' appeal, Oklahoma law required that the aider and abettor (1) personally intended the death of the victim; and (2) aided and abetted with full knowledge of the intent of the perpetrator. In denying Spears post-conviction relief, the OCCA provided the following definition of aiding and abetting:

Aiding and abetting in a crime requires the State to show that the accused procured the crime to be done, or aided, assisted, abetted, advised or encouraged the commission of the crime. While we have held mere presence or acquiescence, without participation, does not constitute a crime, only slight participation is needed to change a person's status from

(continued...)

§ 2254(d)(1).

## ii.    Spears and Felony Murder

Spears argues that, because the evidence supporting the underlying felony of robbery with a dangerous weapon was weak, the evidence supporting felony murder was necessarily weak as well.    The OCCA held that "a rational jury viewing the evidence in the light most favorable to the State could find the State proved beyond a reasonable doubt that Spears participated in taking Thompson's pickup." Spears, 900 P.2d at 439 (applying without citing Jackson).  The OCCA pointed to the following evidence to support Spears' taking of the truck:

> During the evening of September 21, 1990, Spears proposed the group drive out to the Klondike Cemetery.  Hensley and Johnson testified as they drove out to the cemetery Powell and Spears discussed beating Thompson and taking his pickup.  When they arrived at the cemetery, Powell told Spears, Johnson and Daniels he would strike Thompson as they walked towards the cemetery and advised the others to join in.  The group started towards the cemetery and Powell struck Thompson in the head.  Johnson and then Spears joined Powell in kicking, stomping and beating Thompson.  When Powell, Spears and Johnson returned to the pickup, they took the pickup and Thompson's wallet.  Spears directed Johnson to take the truck to Tulsa and sell it.  While Spears may not have driven Thompson's pickup from the cemetery or taken it to Tulsa, we find

---

[23](...continued)
    mere spectator into an aider and abettor.

Spears, 900 P.2d at 438 (citations omitted); cf. Wingfield, 122 F.3d at 1332.  We are not convinced that the OCCA altered the aider-and-abetter requirements, and a state court may interpret its own laws.  See Garner v. Louisiana, 368 U.S. 157, 166 (1961); see also Willingham, 296 F.3d at 923.

42

directing its disposition certainly constitutes aiding and abetting. . . . [This] evidence sufficiently proves Spears wrongfully took Thompson's pickup from him by force using his hands and feet as dangerous weapons.

Id. (footnote omitted).

Recognizing that "killing may precede, coincide with or follow the robbery and still be done in the commission of robbery with a dangerous weapon," the OCCA found that there was sufficient evidence to prove that Spears killed Thompson during the commission of a robbery with a dangerous weapon:

> Hensley and Johnson testified they heard Spears and Powell talking about beating Thompson and taking his pickup. Spears and Powell then carried out their plan by beating and later stabbing Thompson and taking his truck. Spears directed Johnson to take Thompson's pickup to Tulsa and sell it. This evidence sufficiently established a plan to rob and beat Thompson which was then carried out. Clearly, Thompson was killed during the course of the robbery.

Id. at 440. Spears clearly participated in the beating and stabbing and in the plan to dispose of the truck. Even though Spears did not personally take the truck, his participation established his guilt under Oklahoma law. This leads to our conclusion that the OCCA's determination was not an unreasonable application of Jackson. See 28 U.S.C. § 2254(d)(1).

### iii.    Powell and Felony Murder

Powell argues that there was insufficient evidence to show that robbery was the motive for the murder or that he had the intent to commit robbery with a dangerous weapon. According to Powell, the evidence showed that he intended to

43

beat Thompson, but did not intend to kill him or steal his truck or wallet. As succor, Powell points to evidence that Thompson permitted others to drive his pickup the night of the murder and that Johnson bought beer because Thompson had no money. Powell also points to evidence indicating that, after the beating, Daniels suggested taking Thompson's wallet, and Powell did not want any of the proceeds of the truck after Johnson sold it. Finally, Powell asserts that he was not informed of a meeting between the prosecutor and Hensley held after the preliminary hearing, during which Hensley, for the first time, remembered the on-the-way-to-the-cemetery discussion between Powell and Spears about taking Thompson's pickup, and after which she was released from jail.

Considering the testimony of Hensley and Johnson, that they heard Powell and Spears talking about beating Thompson and taking his truck before the attack, the OCCA found that there was sufficient evidence to show that Powell intended to rob Thompson. Powell, 906 P.2d at 773–74. We agree that this evidence, viewed in the light most favorable to the State, is sufficient to show that robbery was the motive for the homicide, and conclude that the OCCA's decision therefore was not an unreasonable application of Jackson. See 28 U.S.C. § 2254(d)(1).

Further, Powell argues that there was insufficient evidence to show that the murder occurred during the commission of a robbery with a dangerous weapon,

44

because the group had permission to drive Thompson's truck and Thompson was killed before anyone suggested taking his wallet. Powell also argues that, because Thompson was dead before the robbery, there was no relationship between the killing and the robbery.

Recognizing that in Oklahoma a "killing may precede, coincide with or follow the robbery and still be done in the commission of robbery with a dangerous weapon," the OCCA decided that "a rational jury viewing the evidence in the light most favorable to the State could find the State proved beyond a reasonable doubt all of the essential elements of First Degree Felony Murder with the underlying felony of Robbery with a Dangerous Weapon." Powell, 906 P.2d at 774 (applying without citing Jackson). The court pointed to evidence establishing a plan to rob and beat Thompson, which was then carried out:

> Hensley and Johnson testified that as they drove out to the cemetery Powell and Spears talked about beating Thompson and taking his pickup. Hensley testified she heard Powell ask "[w]ho is going to hit him first" as the group walked towards the cemetery. Powell, Spears and Johnson then attacked Thompson. When Powell, Spears and Johnson returned to the pickup, they took Thompson's pickup and retrieved his wallet. . . .
>
> Additionally, Powell admitted he struck, stomped and kicked Thompson. He confessed that after the initial beating he, Spears and Johnson decided to steal Thompson's pickup and kill Thompson. They went back to where Thompson was lying and all three stabbed him. Because two of the stab wounds were perimortem establishing Thompson was not dead when the stabbing began, Powell's admission they decided to kill Thompson and steal his pickup is sufficient to show they killed Thompson during their robbery plan.

45

Id. Based upon the totality of the evidence , we conclude that the OCCA's determination was a reasonable application of Jackson. See 28 U.S.C. § 2254(d)(1).

Finally, Powell argues that there was no evidence that Thompson was killed with Powell's tennis shoes or a knife. Notably, on direct appeal and in his habeas petition, Powell argued solely that there was no evidence that a knife was the dangerous weapon. Indeed, on direct appeal, Powell argued that it was "arguably supportable" that the shoes were a dangerous weapon. (Powell's Direct Appeal Br. at 34.)

The OCCA's conclusion that Powell took the pickup by use of a dangerous weapon, either by Powell's hands or feet, or the knife, was reasonable.[24] See Powell, 906 P.2d at 774–75; 28 U.S.C. § 2254(d)(1). Evidence at trial showed that Thompson was alive when the stabbing began, as two of the stab wounds were peri-mortem, and Johnson testified that with his first stab, blood squirted into his eyes. Even if Thompson was not alive at the time of the stabbing, it is undisputed that Powell used his hands and feet to inflict a beating.

### iv. Powell and Malice Murder

[24] Even assuming he had the intent to rob Thompson, Powell argues that the robbery was merely a robbery by fear or force and his conviction therefore should be modified to second-degree felony murder. The record does not support this assertion.

46

Powell argues that the evidence was insufficient to show that he killed Thompson with malice aforethought. Rather, he contends that the evidence shows only that he had the intent to beat Thompson, but was forced to stab him. Powell further argues that it was undisputed that Thompson was already dead when he stabbed Thompson and that any intent Spears had to kill Thompson could not be imputed to Powell. Lastly, Powell asserts that he could not form the specific intent to kill because he was under the influence of alcohol at the time of the incident.

Recognizing that a design to commit murder can be formed instantly, the OCCA rejected Powell's argument, deciding that a rational jury could find Powell guilty of malice murder:

> Powell told Hensley and Daniels he wanted to assault Thompson. Powell admitted he repeatedly beat, stomped and kicked Thompson. After the initial beating, Powell, Spears and Johnson decided to steal Thompson's truck and to kill him. They went back to Thompson's body and repeatedly stabbed him. Johnson testified they did not initially intend to kill Thompson, but at some point they changed their minds and intended to kill him. Both Daniels and Johnson testified Powell instigated the beating of Thompson. Powell's own admissions support his conviction for First Degree Malice Murder.

Powell, 906 P.2d at 775.

We conclude that this determination constituted a reasonable application of Jackson. See 28 U.S.C. § 2254(d)(1). In Oklahoma, external circumstances are evidence of an intent to commit murder. See Okla. Stat. tit. 21, § 701.7(A); see

47

also O.R. at 118, Instruction No. 13 (indicating that "words, conduct, demeanor, motive, and all other [external] circumstances" may be considered in determining whether a defendant had intent to kill). Circumstantial evidence of Powell's intent to commit murder is compelling—most probative of his intent is the duration and violence of the beating. Powell forcefully hit, jumped on and kicked Thompson's head and body for three to ten minutes, the beating continued after Thompson was helpless, and the attackers left the body at the remote cemetery site. After the beating and before he stabbed Thompson, Powell checked on Thompson's breathing and heartbeat. As the district court decided, a reasonable interpretation of this evidence is that Powell formed an intent to kill during the beating and, when under the impression that Thompson was still alive, Powell and his co-defendants stabbed Thompson to ensure his death. See Okla. Stat. tit. 21, § 702 ("A design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed."); id. § 703 ("A design to effect death sufficient to constitute murder may be formed instantly before committing the act by which it is carried into execution."). Regardless whether Powell voluntarily stabbed Thompson and whether Thompson was dead by the time Powell stabbed him, the jury reasonably could infer an intent to kill from this beating. Furthermore, as discussed below, see infra Section III.B.3., Powell was not sufficiently intoxicated to preclude him from forming the intent to

48

murder.

### 3. Failure to Instruct on Voluntary Intoxication and Manslaughter

Powell contends that the trial court should have instructed the jury on voluntary intoxication and first-degree diminished-capacity manslaughter—that the evidence raises a reasonable doubt about his ability to form the specific intent to commit malice murder due to the quantity of alcohol he consumed on the evening of the homicide.

As to this allegation, the OCCA held that there was insufficient evidence to support voluntary intoxication and first-degree manslaughter instructions because there was no evidence that Powell was so intoxicated that he was unable to form the necessary intent to commit first-degree malice murder. Powell, 906 P.2d at 778. To the contrary, the court found that the evidence showed that "Powell was in control of his mental faculties and not in an advanced state of intoxication." Id. In so deciding, the court noted the following evidence:

> Hensley, Daniels and Johnson described Powell as "feeling good" but not drunk, half drunk and half sober, and having a "pretty good buzz on." Johnson testified he knew what he was doing and the risks of his conduct and that at some point he, Spears and Powell intended to kill Thompson. Further, Powell never told Officer Wigley during his confession that he was drunk and did not intend to kill Thompson.

Id.

49

### a. Voluntary Intoxication

There is no Supreme Court precedent establishing a constitutional right to instructions regarding the defendant's intoxication at the time of the crime. See generally Montana v. Egelhoff, 518 U.S. 37, 39–40, 43, 51, 56 (1996) (holding that a Montana statute precluding consideration of voluntary intoxication in determining existence of a mental state that is an element of the criminal offense does not violate the Due Process Clause). Under Oklahoma law, however, juries may consider voluntary intoxication to determine if a defendant had the intent to commit first-degree murder. See, e.g., Bland v. State, 4 P.3d 702, 715 (Okla. Crim. App. 2000); Fitzgerald v. State, 972 P.2d 1157, 1174 (Okla. Crim. App. 1998); Lamb v. State, 767 P.2d 887, 889–90 (Okla. Crim. App. 1988). "[A] defense of voluntary intoxication requires that a defendant, first, be intoxicated and, second, be so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent or special mental element of the crime." Toles v. Gibson, 269 F.3d 1167, 1177 (10th Cir. 2001) (quoting Jackson v. State, 964 P.2d 875, 892 (Okla. Crim. App. 1998)), cert. denied, 123 S. Ct. 1623 (2003).

On federal habeas review, we review the alleged error in failing to instruct on voluntary intoxication in the context of the entire trial, only for the denial of fundamental fairness and due process. See Henderson v. Kibbe, 431 U.S. 145,

156–57 (1977) (pre-AEDPA) (addressing the omission of a jury instruction on causation); Foster v. Ward, 182 F.3d 1177, 1193–94 (10th Cir. 1999) (post-AEDPA) (addressing the omission of an instruction on accomplice testimony, which was required under state law but not mandated by federal Constitution). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson, 431 U.S. at 155.

Illuminated by the high standards of review imposed by AEDPA, the trial court's failure to give voluntary-intoxication instructions did not render Powell's trial fundamentally unfair.[25] As the OCCA noted, little evidence supported a voluntary-intoxication defense. Powell's statement to Officer Wigley recounting the details of the murder further belies his claim of voluntary intoxication. See Toles, 269 F.3d at 1177. Although the evidence indicated that Powell consumed alcohol before the murder, no evidence established that his judgment was so impaired at the time of the murder such that it was impossible for him to form malice aforethought. Accordingly, the OCCA's decision that there was insufficient evidence to support a voluntary-intoxication instruction was reasonable. See 28 U.S.C. § 2254(d)(1).

---

[25] Powell further suggests that failure to instruct on voluntary intoxication took away the jury's ability to consider a non-capital third option that was supported by the law and the evidence. Schad, 501 U.S. 624; Beck v. Alabama, 447 U.S. 625 (1980). However, the trial court did instruct on second-degree murder, thereby giving the jury a third sentencing option. See Schad, 501 U.S. at 647–48.

51

### b. Diminished-Capacity Manslaughter

Powell maintains that the trial court's failure to instruct on first-degree diminished-capacity manslaughter violated the mandates of Beck v. Alabama, 447 U.S. 625 (1980). As recognized by the OCCA, Powell did not request a first-degree manslaughter instruction. Powell, 906 P.2d at 777. Under our precedent, this failure precludes Powell from prevailing on his Beck claim. See Hogan v. Gibson, 197 F.3d 1297, 1303 n.3 (10th Cir. 1999); Hooks, 184 F.3d at 1234.

Furthermore, the State correctly asserts that because the trial court instructed the jury on the lesser included offense of second-degree murder, Beck is satisfied. Although, under Beck, the trial court need only instruct on one lesser included offense, see Schad, 501 U.S. at 647–48, and the trial court did instruct on second-degree murder, Oklahoma law requires instruction on all lesser degrees of homicide, even when such instruction was not expressly requested, see James v. Gibson, 211 F.3d 543, 555 (10th Cir. 2000). We may not issue the writ of habeas corpus, however, on the basis of a perceived error of state law, "absent a determination that the state law violation rendered the trial fundamentally unfair." Id. (citations omitted). Evidence presented at trial did not establish that Powell was so intoxicated that his mental abilities were overcome or that the intoxication prevented him from acting with malice. See Powell, 906 P.2d at 778. Under the

circumstances of this case, it was not fundamentally unfair for the trial court to conclude that an instruction on first-degree diminished-capacity manslaughter was unwarranted.   See id.

### 4. Prosecutorial Comments

Powell challenges several comments that the prosecutor made during his first-stage closing argument.[26]  Because none of these challenged remarks implicates a specific constitutional right, a prosecutor's misconduct will require reversal of a state court conviction only where the remark "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643; see also Duckett, 306 F.3d at 988.  We address each of the challenged comments in turn.

### a. Evoking Sympathy for the Victim

During his opening argument, the prosecutor told the jury that "[t]he one voice you will not hear is that of Jimmy Dewayne Thompson.  A week from next Monday, Jimmy Dewayne—he went by Dewayne—would have been 23 years old. He was a young man just as these two [defendants] are young."  (3 Tr. at 486.) This statement, Powell tells us, improperly sought to evoke sympathy for the victim.

---

[26]  Powell also challenges several second-stage remarks. We need not address those comments in light of our decision to grant Powell habeas relief from his death sentence.

Powell also challenges the State's presentation of victim-impact testimony during the first stage, specifically when the victim's mother testified about her son. Judith Thompson testified that her son was a high school graduate; had started vocational training; was a slow learner and attended special education classes in high school; went to church every Sunday and Wednesday, as well as special church functions; did not have many friends; and had recently broken up with his girlfriend. In addition, Mrs. Thompson testified that her son was neat, very obedient, and well mannered, never in trouble with the law. He did not make friends easily, and was bashful, withdrawn, and easily led by others.

In his first-stage closing argument, the prosecutor further argued that the victim

> was a young man. . . . He was shy. . . . He wanted to belong.
>
> He was susceptible to peer pressure. He was a good, decent kid. He was out of his element with [the defendants] and that group. He represented no threat socially or physically to these two [defendants]. He put up no fight when the incident occurred, couldn't defend himself.
>
> Perhaps, he was socially awkward, but he was not deviant or delinquent in any way. He gave no evidence of a depraved mind. He was the one that used his vehicle to take everybody riding around.
>
> . . . [T]here's a kid that ain't bad. . . . [H]e wanted to get along. He was susceptible to peer pressure, and he did this drinking number with these guys. But he wasn't part of their group.

(5 id. at 1390–91.) The prosecutor emphasized what a "good kid" the victim was, compared with the defendants, noting that the victim agreed to take the group "riding around. . . . But I got to go by the hospital to see my grandmother. That tells you a lot about the kid, right there," id. at 1338; "[w]e're trying to paint a picture of a good kid," id. at 1391–92; "[y]ou can't tell whether he was a good kid from looking at him laying dead on the side of the road," id. at 1393.

Holding that the prosecutor's remarks were in error, the OCCA stated that "it is improper for the prosecution to ask jurors to have sympathy for victims" and "it is error to introduce victim impact evidence in the guilt/innocence phase." Powell, 906 P.2d at 777. Nonetheless, the court determined that this error did not deny Powell a fundamentally fair trial. See id. We conclude that the OCCA's decision on this issue was a reasonable application of established Supreme Court precedent. See 28 U.S.C. § 2254(d). We note that Mrs. Thompson's personal remarks about her son constituted but a brief portion of her otherwise relevant testimony, during which she identified the clothing her son had worn the night he was murdered, his personal effects, and his stolen truck, as well as detailing her son's activities preceding the murder, her search for him when he did not return home that night, and her discovering his stolen truck the next morning. Any improper comments, interspersed with this relevant evidence, did not affect the jury's verdict or deny Powell a fair trial. See, e.g., Duckett, 306 F.3d at 991–92

55

(rejecting habeas challenge to State's first-stage victim-impact argument); Hawkins v. Mullin, 291 F.3d 658, 677 (10th Cir. 2002) (rejecting a habeas claim challenging the State's first-stage evidence concerning the victim's personal history and her attributes as a mother), cert. denied, 123 S. Ct. 1012 (2003).

Powell also contends that the prosecutor improperly dehumanized Powell by indicating to the jury that, while the victim was a good kid, Powell and Spears were bad people. Powell points us to these allegedly improper statements made by the prosecutor:

> These are things I think of when they administer a three-and-a-half to five minute brutal beating of a man who is already defenseless. Now, was he dead? Why does Mickey Daniels tell you that there was screaming? Why was he screaming? He wasn't saying words like: Help me. Save me. Stop this. He's screaming. His voice is gurgling quite a little bit. This man is in misery. This man is dying a gruesome, painful, lengthy death.

(5 Tr. at 1398–99.)

Without specifically addressing these remarks, the OCCA denied Powell relief. See Powell, 906 P.2d at 776. We concur. The prosecutor's remarks were appropriate commentary on the evidence presented at trial. See Hooper v. Mullin, 314 F.3d 1162, 1172 (10th Cir. 2002). Prosecution comments as to the brutality of the beating were arguably in response to the defense argument that this incident was a fight, rather than a sadistic beating.

### b. Telling Jurors They Had a Moral Duty to Convict Powell

Powell challenges the prosecutor's following statements to the jury, telling them that they could

> opt for Murder in the Second Degree. You can take an easy way out, if that's what you do. But you have told us in your voir dire examination that you are willing to make the tough decisions.

> It's like Robert Kennedy once said, "If not us, who? If not now, when?" Somebody has got to make these tough decisions. And we ask that you do that.

(5 Tr. at 1340–41.) Along the same lines, the prosecutor later argued that

> [w]e ask you find [Spears and Powell] guilty of Murder in the First Degree. We don't tiptoe up to the rail and ask daintily. We think that justice cries out for it. If extremism in the defense of liberty is no vice, as Barry Goldwater said, "Moderation in the pursuit of justice is no virtue; let us not moderate."

> This is not a moderate crime, and these people aren't moderately guilty. They are guilty of the crime of Murder in the First Degree. And we ask simply that you not let sympathy, sentiment, or prejudice, interfere with that. Let not the consideration that you might have to confront the death penalty keep you from your appointed rounds, and find the defendants guilty of Murder in the First Degree.

(5 id. at 1404–05.)

We hold that the OCCA's decision denying Powell relief on this claim, see

Powell, 906 P.2d at 776, was not an unreasonable application of established

Supreme Court precedent, see 28 U.S.C. § 2254(d). Although "it is error for a prosecutor to exhort a jury" to reach a guilty verdict based "on the grounds of civic duty," Viereck v. United States, 318 U.S. 236, 247–48 (1943), we cannot say that these challenged remarks resulted in a fundamentally unfair trial. See Le v. Mullin, 311 F.3d 1002, 1022 (10th Cir. 2002).

### c. Cumulative Effect of Challenged Prosecutorial Comments

Cumulatively, Powell argues, the effect of these challenged prosecutorial remarks resulted in a fundamentally unfair trial. Because the OCCA never considered these remarks cumulatively, we consider this argument de novo. Hooker, 293 F.3d at 1237. Even considering these remarks in the aggregate, we cannot conclude that they resulted in a fundamentally unfair proceeding. See Le, 311 F.3d at 1023–24.

### 5. Ineffective Trial Representation

Spears and Powell assert that their attorneys' first-stage trial representation was ineffective.[27] To establish ineffective assistance of counsel, they must establish both that their attorneys' performance was constitutionally deficient and

[27] Because we affirm the district court's grant of habeas relief from Spears' and Powell's capital sentences, we need not address their claims challenging their trial attorneys' second-stage representation, including Spears' assertion that his trial attorneys were ineffective for failing to obtain a mental-health expert for sentencing purposes and Powell's claim that his attorney should have requested a second-stage instruction requiring the jury to determine his individual culpability.

58

that this deficient performance prejudiced their defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  Counsel's performance is deficient if it falls below an objective standard of reasonableness.  Id. at 687–88.  The prejudice prong is established if there is a reasonable probability that, but for counsel's unprofessional errors, the jury would have had a reasonable doubt concerning their guilt.  Id. at 694–95.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.

In denying Spears relief on his ineffective-assistance claims, the OCCA applied Strickland, but as further restricted by Lockhart v. Fretwell, 506 U.S. 364 (1993):  "A mere showing that a conviction would have been different but for counsel's errors would not suffice to sustain a Sixth Amendment claim," without an additional inquiry into the fairness of the proceeding.  Spears, 900 P.2d at 445. Application of this more onerous standard was contrary to the Supreme Court's clearly established precedent in Strickland.  See Williams, 529 U.S. at 391–95. Under AEDPA, we therefore do not afford any deference to the OCCA's determination and, instead, review Spears' ineffective-assistance-of-counsel claims de novo.  See Revilla v. Gibson, 283 F.3d 1203, 1220 n.14 (10th Cir.), cert. denied, 123 S. Ct. 541 (2002).

By contrast, in reviewing Powell's claims, the OCCA properly applied Strickland.  See Powell, 906 P.2d at 780.  We therefore proceed to review the

59

OCCA's decision in Powell's case to determine whether or not it applied Strickland in an objectively reasonable manner. See 28 U.S.C. § 2254(d); see also Bell v. Cone, 535 U.S. 685, 122 S. Ct. 1843, 1852 (2002).

### a. Trial Counsel Failed to Object to First-Stage Victim-Impact Testimony

Spears and Powell challenge their attorneys' failure to object to both the victim-impact evidence presented during the trial's first stage and the prosecutor's comments on this evidence throughout his first-stage argument.[28] Assuming attorney deficiency on this basis,[29] however, neither Spears nor Powell can establish prejudice. We are unable to conclude that a reasonable probability exists that, had their respective counsel timely and successfully objected to this testimony and commentary, thus precluding it from going to the jury, the jury would have acquitted the defendants of first-degree murder. As discussed above, the victim's mother's testimony relating her son's personal attributes was only a small portion of her otherwise relevant first-stage testimony. Additionally, the

---

[28] Because we affirm the district court's granting Spears and Powell habeas relief from their death sentences, we need not further address petitioners' arguments that prejudice from the State's first-stage victim-impact evidence and comment also tainted their capital sentences.

[29] We recognize that some of the prosecutor's remarks explaining how the victim came to be in this group's company were, in fact, relevant to the State's case and proper comment on admitted evidence.

State's evidence overwhelmingly establishes that both Spears and Powell were involved in the beating that resulted in the victim's death and none of the challenged comments and testimony went to the primary contested issue at trial, intent to kill.

Under our de novo review, we conclude that Spears has not satisfied both prongs of Strickland, and thus he is not entitled to habeas relief. On this same basis, we conclude that the OCCA's decision to deny Powell relief on this claim was a reasonable application of Strickland. See Powell, 906 P.2d at 780-81.

### b. Trial Counsel Failed to Object to Other Instances of Prosecutorial Misconduct

Spears further asserts that his trial attorney was deficient for failing to object when the prosecutor expressed his personal opinion about Spears' guilt by telling jurors that "justice cries out" for a guilty verdict and that convicting Spears of only second-degree murder would be taking the easy way out. Even assuming defense counsel was deficient in failing to make these objections, Spears again cannot establish that, had the prosecutor not made these comments, there is a reasonable probability that the jury would have acquitted him of first-degree murder.

### c. Trial Counsel Failed to Object to Flight Instruction

Spears argues that his counsel was deficient for failing to object to the

flight instruction given to the jury. Jurors were instructed that, if they found beyond a reasonable doubt that Spears had taken flight soon after the crime, then they could consider that fact in determining whether Spears was guilty of first-degree murder. The jury instruction defined "flight" as a departure, with consciousness of guilt, in order to avoid arrest. Id. Spears first asserts that his attorney should have objected to this instruction because there was insufficient evidence that he took flight after the murder. The OCCA, however, reasonably determined that the State had presented sufficient evidence to support giving the flight instruction. See Spears, 900 P.2d at 446. Spears' counsel, therefore, was not deficient in failing to object on that basis.

Spears further argues that trial counsel should have objected to this instruction based upon Mitchell v. State, 876 P.2d 682 (Okla. Crim. App. 1993), corrected by 887 P.2d 335 (Okla. Crim. App. 1994). Mitchell, decided after Spears' trial, held that the trial court should give this flight instruction only "where the evidence [of flight] is controverted." Id. at 685. On Spears' direct appeal, the OCCA acknowledged that "[b]ecause Spears did not testify at trial or offer any explanation of his departure, giving the flight instruction under the Mitchell rule would appear to be error." Spears, 900 P.2d at 446. Nonetheless, the OCCA denied Spears relief on this claim because Mitchell, interpreting state law, applies only prospectively. See Rivers v. State, 889 P.2d 288, 291–92 (Okla.

62

Crim. App. 1995).

Spears asserts that his trial counsel was ineffective for failing to make the same objection to the flight instruction that later succeeded in Mitchell. "Generally, [however,] counsel is not ineffective for failing to anticipate arguments or appellate issues that only blossomed after defendant's trial . . . ." Sherrill v. Hargett, 184 F.3d 1172, 1175 (10th Cir. 1999). This principle applies in the instant case as well. See Nguyen v. Reynolds, 131 F.3d 1340, 1356–57 (10th Cir. 1997) (holding trial and appellate counsel were not ineffective for failing to raise a Mitchell claim before the OCCA decided Mitchell). Mitchell had reversed "decades of [Oklahoma] jurisprudence dealing with the flight instruction." Pickens v. State, 910 P.2d 1063, 1070 (Okla. Crim. App. 1996); see also id. (noting that, "[a]s Mitchell points out," the OCCA "had upheld the flight instruction against numerous attacks" prior to Mitchell); Paxton v. State, 867 P.2d 1309, 1317 (Okla. Crim. App. 1993) ("Evidence of a defendant's flight has long been held admissible as tending to show consciousness of guilt."). Therefore, trial counsel's failure to foresee the OCCA's Mitchell decision did not fall below an objective standard of reasonableness. See Nguyen, 131 F.3d at 1357; see also, e.g., Ellis v. Hargett, 302 F.3d 1182, 1187–89 (10th Cir. 2002) (holding appellate counsel was not objectively unreasonable in failing to raise a claim where cases "on the books" at the time of direct appeal indicated that the

63

OCCA would not have been receptive to a contrary argument), cert. denied, 123 S. Ct. 1361 (2003); Bullock, 297 F.3d at 1051–52 (rejecting a claim that the trial attorney should have objected to the victims' hearsay testimony, based on a case the state appellate court decided after the petitioner's trial and noting that effective representation does not require clairvoyance). For the foregoing reasons, Spears is not entitled to habeas relief on this claim.

### d. Trial Counsel Failed to Object to Spears' Out-of-Court Statement Implicating Powell

Given our conclusion above that the OCCA reasonably determined that any Bruton error was harmless, we hold that the OCCA's decision denying Powell relief on his contention that his trial attorney should have objected to the State's introduction of Spears' out-of-court statement implicating him was also a reasonable application of established federal law. See supra Section III.B.1.a; Powell, 906 P.2d at 780.

### e. Trial Counsel Failed to Request Jury Instructions on Voluntary Intoxication and Diminished-Capacity Manslaughter

This same fate falls upon Powell's claim that his trial counsel should have requested instructions on a voluntary-intoxication defense and the lesser offense of diminished-capacity manslaughter. We have already concluded that the state appellate court reasonably held that the evidence did not support giving these instructions. See supra Section III.B.3. For the same reasons, the OCCA reasonably denied relief on these ineffective-assistance claims. See Powell, 906 P.2d at 780; see also id. at 777–78; cf. Le, 311 F.3d at 1026–27 (holding that defense counsel was not ineffective for failing to request a self-defense instruction, where the evidence did not permit such instruction under Oklahoma law).

### f. Cumulative Prejudice

Because the sum of various zeroes remains zero, the claimed prejudicial effect of their trial attorneys' cumulative errors does not warrant habeas relief. See, e.g., Hawkins v. Hannigan, 185 F.3d 1146, 1158 (10th Cir. 1999) (considering prejudice resulting from several instances of deficient performance). As to Spears, we have concluded above that his trial attorney was not deficient in failing to object to the flight instruction. Moreover, even assuming that his

65

attorney was deficient in not objecting to the victim-impact testimony and to the prosecutor's argument generally, the cumulative effect of those presumed errors was insufficient to create a reasonable probability that, but for those errors, the jury would not have convicted Spears of first-degree murder. Similarly, Powell has failed to establish that the cumulative effect of any prejudice he may have suffered as a result of his attorney's allegedly deficient performance warrants habeas relief.

### 6. Powell's Ineffective-Assistance Claims Defaulted in State Court

Powell raised additional ineffective-trial-counsel claims in his first state post-conviction application, claiming that his defense attorney (1) inadequately advised him concerning the State's plea offer, (2) failed to object to victim-impact evidence, (3) failed to impeach Officer Wigley's testimony that Powell admitted to him that the group, including Powell, had intended to steal the victim's truck and that is why they had to kill Thompson, and (4) should have obtained an expert who could have testified to Powell's level of intoxication at the time of the murder.[30] Because Powell failed to raise these particular claims on direct appeal, however, the OCCA, relying on 1995 amendments to Oklahoma's

---

[30] Because we affirm the district court's decision granting Powell habeas relief from his capital sentence, we need not consider here his claims challenging his trial attorney's preparation for the capital sentencing proceeding, failure to present additional mitigating evidence at that proceeding, and failure to object to second-stage victim evidence.

post-conviction statute, deemed the claims procedurally defaulted. See Powell, 935 P.2d at 381–82 & 381 n.7.

To preclude federal habeas review, a state procedural bar must be adequate, as well as independent from federal law. See, e.g., Lee v. Kemna, 534 U.S. 362, 375 (2002). In the case at bar, the district court held that Oklahoma's procedural bar was inadequate because the OCCA applied the 1995 post-conviction amendments, even though they were not yet in effect at the time Powell's purported default occurred. "In determining whether a state procedural bar is an adequate and independent ground to bar federal review of a constitutional claim, a federal habeas court must [instead] apply the state's rule in effect at the time of the purported procedural default." Barnett v. Hargett, 174 F.3d 1128, 1134 (10th Cir. 1999). After all, "a defendant cannot be expected to comply with a procedural rule that does not exist at the time of the purported default." Rogers v. Gibson, 173 F.3d 1278, 1290 (10th Cir. 1999) (quotation omitted). Before Oklahoma enacted the relevant 1995 amendments, however, Oklahoma courts regularly and consistently barred claims a criminal defendant could have raised, but failed to assert, on direct appeal. See, e.g., Neill v. Gibson, 278 F.3d 1044, 1054, 1057 (10th Cir. 2001), cert. denied, 123 S. Ct. 145 (2002); McCracken v. Gibson, 268 F.3d 970, 976 (10th Cir. 2001), cert. denied, 123 S. Ct. 165 (2002). The 1995 amendments, therefore, did not change that aspect of Oklahoma's

procedural-default rule. See Cargle, 317 F.3d at 1201.

Nonetheless, Oklahoma's procedural rules requiring a criminal defendant to raise ineffective-trial-counsel claims on direct appeal are not adequate unless that defendant is represented at trial and on appeal by different attorneys, and either the defendant's ineffective-trial-counsel claim could be resolved solely on the trial record before the direct-appeal court or the defendant could have expanded the direct-appeal record to present his ineffective-assistance claim adequately. See English v. Cody, 146 F.3d 1257, 1263, 1264–65 (10th Cir. 1998); Hooks, 184 F.3d at 1214–15, 1216–17; see also, e.g., James, 211 F.3d at 556. Powell was represented on appeal by a different attorney, and the State asserts that, in fact, Powell could have adequately expanded and developed the direct-appeal record sufficiently to permit him to raise these ineffective-trial-counsel claims on direct appeal. Cf. Romano, 239 F.3d at 1180 (holding that the same procedural-bar rule was inadequate without addressing whether the petitioner could have adequately expanded the direct-appeal record). While we are mindful that the State bears the ultimate burden of proving that its procedural mechanism was adequate, the habeas petitioner must also allege with specificity why the state procedural rules were inadequate to have permitted him to raise the omitted claim on direct appeal. See Smallwood, 191 F.3d at 1268; Hooks, 184 F.3d at 1216–17. However, because Powell does not address his alleged procedural default, let alone

68

challenge the adequacy of Oklahoma's procedural rules, we conclude that Oklahoma's procedural bar is adequate to preclude our habeas review of these particular ineffective-trial-representation claims.[31] Furthermore, Powell fails to allege either cause excusing this default and prejudice, or that this court's refusal to consider the defaulted claims will result in a fundamental miscarriage of justice. See, e.g., Coleman v. Thompson, 501 U.S. 722, 750 (1991). We therefore decline to address the merits of these barred claims. See, e.g., Cannon v. Gibson, 259 F.3d 1253, 1265–66 (10th Cir. 2001) (declining to review procedurally defaulted habeas claim, even though the district court had addressed the merits of the claim), cert. denied, 535 U.S. 1080 (2002). Even were we to address the merits of Powell's defaulted claims, we are confident they do not warrant habeas relief.

---

[31] Hooks set forth the habeas petitioner's burden to challenge the adequacy of a state procedural bar. In Smallwood, we declined to presume an unchallenged state procedural bar was adequate to preclude habeas review where the habeas petitioner filed his § 2254 petition prior to this court's Hooks decision, in July 1999. See Smallwood, 191 F.3d at 1268. Although, like the petitioner in Smallwood, Powell filed his § 2254 petition prior to Hooks, Powell has failed to assert before this court any challenge to the adequacy of Oklahoma's procedural-default rule. Under these circumstances, we conclude that he has waived such a challenge.

## 7. Spears' Procedurally Defaulted Ineffective-Trial-Counsel Claims

In his § 2254 petition, Spears asserted for the first time several additional ineffective-trial-counsel claims, claiming that his attorney (1) failed to advise him adequately concerning the State's plea offer, (2) failed to obtain an expert witness to testify that Spears was so intoxicated at the time the murder occurred that he could not have formed the intent required for first-degree murder, and (3) failed to introduce evidence that Spears did not have any blood on his clothes after the murder.[32] To permit Spears to exhaust his state-court remedies as to those particular ineffective-assistance claims, see 28 U.S.C. § 2254(b)(1), the district court abated Spears' federal habeas petition. Accordingly, Spears asserted these claims to the OCCA in a second state post-conviction application. Determining that Spears defaulted these claims because he had failed to raise them in his first post-conviction application, the OCCA denied Spears relief.

Spears now argues that the district court erred in requiring him to exhaust his state-court remedies on these claims because Oklahoma's state post-conviction procedures are ineffective to safeguard his constitutional rights. See id. § 2254(b)(1)(B). Because Spears complied with, and did not appeal, the district court's directive to exhaust state-court remedies, however, this argument is moot

---

[32] We need not address an additional claim, challenging Spears' attorney's preparation for the capital sentencing proceeding.

as all previously unexhausted claims are now exhausted. See Odum v. Boone, 62 F.3d 327, 332–33 (10th Cir. 1995). We have previously rejected a similar argument—that it is futile to require a petitioner to present unexhausted claims in a post-conviction petition when the OCCA routinely deems such claims procedurally barred if not presented first on direct appeal—on the basis that this court already upheld the adequacy of this particular Oklahoma procedural bar. See Cargle, 317 F.3d at 1212 n.15.

Spears contends, however, that the OCCA declined to review these ineffective-trial-counsel claims, not because it deemed them barred, but because it mistakenly believed Spears had previously raised these same claims in his first state post-conviction application. In reviewing the OCCA's decision, it is apparent that the OCCA "clearly and expressly" applied the state procedural-default rule, Harris v. Reed, 489 U.S. 255, 263 (1989) (quotation omitted), to Spears' additional ineffective-trial-counsel claims. Spears' contention is without merit.

In challenging Oklahoma's procedural rule that claims not raised in a first post-conviction petition are defaulted, Spears contends that Oklahoma's post-conviction proceedings do not provide sufficient review of his ineffective-trial-counsel claims. While a state procedural bar will be inadequate if it deprives a defendant of any meaningful review of his claims, see, e.g., Brecheen v.

71

Reynolds, 41 F.3d 1343, 1364 (10th Cir. 1994), we have previously upheld the adequacy of this particular Oklahoma procedural rule. See, e.g., Cannon, 259 F.3d at 1266 (citing other cases).

Despite this authority, Spears argues that this particular procedural-default rule is inadequate to preclude federal habeas review because the OCCA has, on occasion, chosen to review the merits of a defaulted claim to prevent any miscarriage of justice. A state procedural-default rule will be adequate if the state courts apply it regularly and consistently. See, e.g., Johnson v. Mississippi, 486 U.S. 578, 587 (1988). Pivotal to our analysis "is whether the [state] courts' actual application of the particular procedural default rule to all similar claims has been evenhanded in the vast majority of cases." Maes v. Thomas, 46 F.3d 979, 986 (10th Cir. 1995) (quotation omitted). To support his argument, Spears relies on Valdez v. State, 46 P.3d 703, 704–05, 710–11 (Okla. Crim. App. 2002), and unpublished decisions in Hawkins v. State, No. PC 96-1271 (Okla. Crim. App. Mar. 18, 1998), Clayton v. State, No. PCD-2000-1618 (Okla. Crim. App. Dec. 28, 2000), and Brown v. State, No. PCD-2002-781 (Okla. Crim. App. Aug. 22, 2002); see generally Revilla, 283 F.3d at 1210 n.3 (noting that Hawkins and Clayton, unpublished opinions that may not be binding authority, "at the very least . . . reflect that Oklahoma does not now invariably apply its default rules to bar death-ineligibility issues").

Hawkins, however, is not sufficiently analogous to Spears' case because the OCCA in that case reviewed the merits of Hawkins' claim asserting that he was legally ineligible for a death sentence, raised for the first time in his first state post-conviction application. See Hawkins, No. PC 96-1271, slip op. at 1, 3–4; cf. Steele v. Young, 11 F.3d 1518, 1521–22, 1222 n.5 (10th Cir. 1993) (recognizing that, while Oklahoma courts have made clear that fundamental-error review is available on direct appeal to review claims not raised in the trial court, such fundamental-error review is not available where the defendant has not raised the issue until his state post-conviction application). In Brown, the OCCA did stay the petitioner's execution and remand for a hearing on claims raised for the first time in a second post-conviction application. Brown, however, appears to have been based primarily on newly discovered evidence. See Brown, No. PCD-2002-781, slip op. at 2–3, 2 n.4. We thus conclude that these two unpublished decisions are not sufficiently analogous to inform our determination of whether the OCCA regularly and consistently applies the specific procedural bar it applied in Spears' case.

In Valdez, however, the OCCA did "exercise its power to grant relief when an error complained of has resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right" and did review the merits of a procedurally defaulted claim asserted for the first time in a second

73

post-conviction application.  46 P.3d at 704–05, 710–11.  Similarly, in <u>Clayton</u>, the OCCA reviewed, for a fundamental miscarriage of justice, a procedurally barred claim raised for the first time in a second post-conviction application.  <u>See</u> <u>Clayton</u>, No. PCD-2000-1618, slip op. at 2–5.  Nonetheless, these cases appear to be the only instances where the OCCA overlooked an analogous procedural default in a second or successive state post-conviction application, and, standing alone, these cases are insufficient to overcome Oklahoma's regular and consistent application of this procedural-bar rule in the "vast majority of cases."  <u>Maes</u>, 46 F.3d at 986 (quotation omitted); <u>see also</u> <u>Andrews v. Deland</u>, 943 F.2d 1162, 1190 (10th Cir. 1991).

Oklahoma's procedural bar, therefore, remains adequate to preclude federal habeas review unless Spears can establish cause excusing his default, and resulting prejudice, or that this court's refusal to review these claims will result in a fundamental miscarriage of justice.[33]  <u>See</u> <u>Coleman</u>, 501 U.S. at 750.  Cause excusing a procedural default must be some objective factor external to the

---

[33]  Spears does assert that this court's refusal to consider the merits of his defaulted claims will result in a fundamental miscarriage of justice, but apparently only as to his death sentence.  Because we affirm the district court's decision granting Spears habeas relief from his sentence, we need not address further his assertion of a fundamental miscarriage of justice as it relates to that sentence.  Even were Spears to allege that the fundamental-miscarriage-of-justice exception applies to his defaulted first-stage ineffective-assistance claims, he has not shown he is actually innocent of first-degree murder, as that exception would require.  <u>See</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 321 (1995).

74

habeas petitioner, not fairly attributable to him, that impeded his efforts to comply with the procedural rule in question. See id. at 753.

As cause for his default, Spears reprises his argument that Oklahoma's state post-conviction procedures are insufficient. Further, in conclusory fashion, Spears asserts that "a conflicted defender organization selected and paid an inadequate sum for Mr. Spears's [first] post-conviction counsel." (Spears Second Br. at 70.) Spears fails to explain how better compensation for his attorney would have led to a different result, and, in any event, ineffective representation in state post-conviction proceedings is inadequate to excuse a procedural default. See 28 U.S.C. § 2254(i); see also Coleman, 501 U.S. at 752–53; Smallwood, 191 F.3d at 1269. Just as Spears is unable to establish cause excusing his procedural default, we are precluded from reviewing Spears' defaulted ineffective-assistance claims.

### 8. Evidentiary Hearing

Spears asserts that the district court should have conducted an evidentiary hearing prior to denying relief on his ineffective-trial-representation claims. We reject this argument. As discussed above, four of Spears' ineffective-trial-counsel claims were defaulted, and Spears never requested an evidentiary hearing in state court on his four remaining ineffective-assistance claims. Having defaulted these claims, he must now meet 28 U.S.C. § 2254(e)(2)

75

requirements before he will be entitled to an evidentiary hearing. Spears fails to assert how he meets those requirements, and we deny Spears relief on this claim. See, e.g., Torres, 317 F.3d at 1161.

### 9. Spears' Appellate Representation

Spears contends that his appellate counsel was ineffective for failing to raise his defaulted ineffective-trial-counsel claims on direct appeal.[34] He asserts ineffective appellate representation both as a substantive claim and as additional cause excusing his default of those ineffective-trial-counsel claims. Because Spears failed to challenge his appellate representation until his second state post-conviction proceeding, however, the state appellate court also deemed Spears to have procedurally defaulted these claims. For the reasons discussed in Section III.B.7. above, we are precluded from reviewing his substantive ineffective-appellate-counsel claim. See generally Thomas v. Gibson, 218 F.3d 1213, 1221 (10th Cir. 2000) (recognizing this procedural bar's adequacy). Furthermore, Spears cannot rely on his procedurally defaulted ineffective-appellate-counsel claim to provide cause excusing his barred ineffective-trial-counsel claims, unless he can also establish cause excusing his default of the ineffective-appellate-counsel claim. See Edwards v. Carpenter, 529

---

[34] Again, we need not address this claim to the extent it concerns the capital sentencing proceeding.

U.S. 446, 451–52 (2000).  Spears has failed to do that here.[35]

## 10.  State's Failure to Turn Over Exculpatory Material as Required Under <u>Brady v. Maryland</u>[36]

Finally, Powell contends that the State failed to turn over to his defense counsel a typewritten summary of an audiotaped custodial statement Powell made to authorities.  The State responds that, because Powell did not raise this <u>Brady</u> claim until he applied for state post-conviction relief, the OCCA deemed him to have procedurally defaulted this claim.  For efficiency, we address the merits of Powell's <u>Brady</u> claim.  <u>See, e.g.,</u> <u>Romero v. Furlong</u>, 215 F.3d 1107, 1111 (10th Cir. 2000) (declining to address Colorado's procedural bar to petitioner's claims "because the case may be more easily and succinctly affirmed on the merits").

To succeed on a <u>Brady</u> claim, Powell must establish that the evidence at issue is favorable to him; that the State suppressed this favorable evidence, either willfully or inadvertently; and that prejudice ensued.  <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82 (1999).  By acknowledging that his defense counsel was aware of and had listened to this audiotaped statement prior to trial, Powell defeats his own claim.  We have held that there can "be no suppression by the

---

[35]  Further, because Spears has defaulted this ineffective-appellate-assistance claim, an evidentiary hearing is not warranted.

[36]  373 U.S. 83 (1963).

state of evidence already known by and available to [the defendant] prior to trial."

United States v. Hernandez-Muniz, 170 F.3d 1007, 1011 (10th Cir. 1999)

(quotation omitted).  Furthermore, while "[t]he government violates a

defendant's due process rights when it fails to provide him with exculpatory

information, . . . due process does not necessarily require disclosure in

a specific form or manner."  Id.  Powell's Brady claim does not warrant habeas

relief.

## IV

For the foregoing reasons, we   **AFFIRM**  the district court's grant of habeas

relief as to both death sentences and   **AFFIRM**  the denial of any further habeas

relief.

78

Nos. 01-6258, 01-6267 - Spears v. Mullin
Nos. 01-6349, 01-6354 - Powell v. Mullin

**HARTZ**, Circuit Judge, concurring:

I concur in the result and join all of Judge Lucero's opinion except part III (A), which relates to the State's appeals. Rather than grant relief because of the photographs admitted into evidence during the penalty phase, I would set aside the death penalties because no state decisionmaker—jury or judge—has found that the victim consciously suffered while being murdered. Under Oklahoma law the death penalty should not be imposed in this case unless the victim consciously suffered. The evidence on the matter was hardly uncontroverted; indeed, one of the government's principal witnesses testified that the victim was rendered unconscious by the first blows. Yet, remarkably, the jury was not instructed that it had to find conscious suffering, nor did any court make the necessary finding.

First, Oklahoma law is clear that conscious suffering had to be proved. The Oklahoma Court of Criminal Appeals (OCCA) recognized as much in its decision resolving Mr. Spears's appeal. The court wrote:

> [T]he State bears the burden of proving beyond a reasonable doubt the aggravating circumstances it elects to charge. We must now determine whether there was any competent evidence to support the jury's finding the murder was especially heinous, atrocious or cruel.
>
> In order for a jury to find that a murder was especially heinous, atrocious or cruel, the State must introduce competent evidence indicating the victim's death was preceded by torture or serious

physical abuse, which may include the infliction of either great physical suffering or extreme mental cruelty. Serious physical abuse requires evidence of *conscious* physical suffering. As we stated in *Perry* [*v. State*, 893 P.2d [521,] 534 [Okla. Crim. App. 1995], *it is critical the State prove the victim consciously suffered prior to death.* Prosecutors have proved this aggravator [in other cases] by introducing evidence the victim suffered numerous defensive wounds indicating that the victim was conscious and attempted to fight off her attacker; statements from the defendant indicating the victim consciously suffered serious physical abuse or extreme mental cruelty prior to death; witness testimony that the victim was alive and conscious at the time the physical abuse was inflicted; or medical evidence that the victim was conscious during the infliction of serious physical injury.

*Spears v. State*, 900 P.2d 431, 448-49 (Okla. Crim. App. 1995) (citations omitted; second emphasis added).

Second, there was a real factual dispute concerning whether the victim had consciously suffered. Claiborne Johnson, a participant in the murder who reached a plea agreement with the prosecution, testified that the victim, Dewayne Thompson, was knocked unconscious immediately after Mr. Powell struck the first blows:

> Q: All right. Now, did you ever see, at the time when you first saw [Mr. Thompson] go down, did you ever see him assume any kind of a defensive posture? That is to say, put his arms up in this fashion (indicating) to defend himself?
>
> A: No, I didn't.
>
> Q: Did you ever see him, at any time, whether it be standing up or laying on the ground, take any defensive posture at all?

A:     No I didn't.  Because the time that he hit the ground, he was knocked out.

xvii.  Okay.  Now that is your supposition.  You're not a medical doctor.  You don't know whether he was out or not, do you?

A:     No, I don't know whether or not for sure he was out or not.  It looked like it.

Q:     All right.

A:     The way from how I was looking at him, it looked like he was out.

       . . . .

Q:     Okay.  Let me ask you a question here, okay?  You thought this guy was out; is that correct?

A:     Yes, he wasn't moving.

Trial Tr., Vol. 4, at 1165-66.  Another eyewitness, Vickie Hensley, similarly testified that Mr. Thompson fell directly to the ground after suffering the first blows.  Additionally, no evidence indicated that Mr. Thompson resisted the beating:  He had no defensive wounds, and none of the witnesses testified that he tried to protect himself or that he called for assistance from bystanders.  Moreover, the medical examiner testified that the cause of death was trauma to the brain that could have resulted from a single blow to the head.  Indeed, the

OCCA spoke of "the paucity of evidence supporting the aggravator especially heinous, atrocious or cruel." *Spears*, 900 P.2d at 443.

To be sure, there was also contrary evidence; and I do not dispute the determination by the OCCA that there was "testimony sufficient to allow a rational jury to conclude Thompson was conscious during the beating which preceded his death." *Id*. at 449. My concern, rather, is that no one actually made the finding that Thompson experienced conscious physical suffering.

The function of a criminal trial is not simply for the prosecution to put on enough evidence that a jury *could* find the defendant guilty. The jury has a role to play. The prosecution's evidence counts for naught unless the jury is convinced by it. People do not go to jail because the prosecution presented enough evidence. They go to jail because their juries, after reviewing the evidence, find guilt beyond a reasonable doubt. Likewise, people are not executed simply because the prosecution put on enough evidence to justify the death penalty. They can be executed only if the appropriate decisionmaker *finds* the necessary factual predicates for the death penalty. The only significant difference in this regard between the determination of guilt and the decision to execute is that, at least prior to *Ring v. Arizona*, 536 U.S. 584 (2002), there was no right to have a jury make the death-penalty finding, so the finding could be made by the trial judge or even an appellate court. *See Clemons v. Mississippi*, 494 U.S. 738, 747-

-4-

50 (1990).

Here, we cannot say that the jury found conscious suffering. The term "conscious suffering" appears nowhere in the jury instructions. With respect to the "especially heinous, atrocious, or cruel" aggravator, the jury was instructed only that the "phrase especially heinous, atrocious, or cruel is directed to those crimes where death of the victim was preceded by torture or serious physical abuse." If we knew that the jury had found that the victim had been subjected to torture, we could readily infer a finding of conscious suffering. But the jury was instructed it need only find *either* torture or serious physical abuse. And the jury might well have found serious physical abuse yet not found conscious suffering. The evidence at trial could readily support the conclusion that the victim suffered serious physical abuse (a severe beating and possibly some stab wounds) before death (as required by the instruction) but after having lost consciousness. Thus, in light of the instructions given here, a verdict that the crime was "especially heinous, atrocious, or cruel" does not necessarily imply a finding of conscious suffering.

The failure to instruct the jury on conscious suffering does not, however, end the matter. Under pre-*Ring* law it was not necessary for a jury to find the aggravating circumstance necessary for imposition of the death penalty. A judge, even an appellate court, could make the finding. *See Clemons*, 494 U.S. at 747-

50. But that was not done here. As previously noted, the OCCA in Spears's case determined only that there was sufficient evidence for a jury to find conscious suffering. 900 P.2d at 449. It did not state what its own fact finding would be—whether the court itself was convinced that Thompson had consciously suffered. The OCCA made a similar determination in Powell's appeal, *see Powell v. State*, 906 P.2d 765, 781-82 (Okla. Crim. App. 1995), and similarly failed to make a fact finding of its own.

I recognize that in *Lewis v. Jeffers*, 497 U.S. 764, 783 (1990), the Supreme Court affirmed an Arizona death penalty on the ground that "a rational factfinder could have found that respondent both relished the crime and inflicted gratuitous violence on the victim"—apparently the same standard of review applied by the OCCA in the Spears and Powell appeals. But there is a critical difference between *Lewis* and the cases now on appeal. In *Lewis* the Court was reviewing "the Arizona Supreme Court's *finding* that respondent had relished the killing [and] . . . . that respondent had inflicted gratuitous violence." *Id.* at 783-84 (emphasis added). Thus, an appropriate decisionmaker in that case had already made the requisite fact findings, something not done here.

This circuit's decision in *Moore v. Gibson*, 195 F.3d 1152 (10th Cir. 1999), upon which the State relies, does nothing more than follow the proposition in *Lewis* that "'federal habeas review of a state court's application of a

constitutionally narrowed aggravating circumstance is limited, at most, to determining whether the state court's *finding* was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation.'" 195 F.3d at 1176 (quoting *Lewis*, 497 U.S. at 780) (emphasis added). It further quotes *Lewis* for the proposition that "'[a] state court's finding of an aggravating circumstance in a particular case . . . is arbitrary or capricious if and only if no reasonable sentencer could have so concluded,'" *id.* at 1176 (quoting *Lewis*, 497 U.S. at 783), and then continues, "[a]s discussed more fully below, that is not the case here," *id.* In other words, *Moore* started from the assumption that the state court had found the factual predicates for the aggravating circumstance, thereby limiting the circuit court's role to determining whether the factfinding was rational.

Likewise, *Romano v. State*, 909 P.2d 92 (Okla. Crim. App. 1995), cannot support the State's view, because in that case the court noted that the jury had been instructed on conscious suffering, *id.* at 121 n.18.

The issue here is not a technicality. Nothing is more central to our system of justice than having a factfinder decide the facts. It is not for this court to decide whether Spears and Powell deserve the death penalty. But we must reverse their sentences when no one has made the findings required by Oklahoma law.